Russell William DETTERLINE, Appellant (Defendant Below),

v.

A.P. BONAVENTURA, M.D., Appellee (Plaintiff Below).

No. 3–883A267.

Court of Appeals of Indiana, Third District.

June 28, 1984.

Spangler, Jennings, Spangler & Dougherty, P.C., Merrillville, for appellant; Richard A. Mayer, Robert P. Stoner, Merrillville, of counsel.

David C. Jensen, Paul A. Rake, Eichhorn, Eichhorn & Link, Hammond, for appellee.

STATON, Presiding Judge.

Russell Detterline filed a complaint in civil court against A.P. Bonaventura, M.D. (Dr. Bonaventura) for wrongful commitment to a mental hospital. Dr. Bonaventura moved for summary judgment contending that Detterline failed to submit his claim first to a medical review panel as required by the Indiana Medical Malpractice Act (Act).[1] The trial court agreed and treated the motion for summary judgment as a motion to dismiss; it dismissed Detterline's complaint without prejudice for lack of subject matter jurisdiction. Detterline appeals contending that his claim is not subject to the Act because he was not a "patient" as defined in the Act.

Affirmed.

The standard of review applicable to a trial court's ruling on a motion to dismiss under TR. 12(B)(6) is well established. Motions to dismiss are not favored by the law. *Sacks v. AFNB* (1972), 258 Ind. 189, 279 N.E.2d 807. Trial courts should consider as true all the allegations of the complaint, *Morris v. City of Evansville* (1979), 180 Ind.App. 620, 390 N.E.2d 184, and should view the motion in a light most favorable to the non-moving party, resolving all inferences in his favor. *Theis v. Heuer* (1971), 149 Ind.App. 52, 270 N.E.2d 764. A complaint should not be dismissed unless it appears that the claimant would not be entitled to recover under any set of facts represented by his pleadings. *State v. Rankin* (1973), 260 Ind. 228, 294 N.E.2d 604.

The record reveals that on July 3, 1978, Detterline's wife, a patient of Dr. Bonaventura, pleaded with the Dr. to sign papers which she had had drawn up for Detterline's commitment. The following statement preceded Dr. Bonaventura's signature on Detterline's commitment papers:

"I, A.P. Bonaventura, M.D., of Highland, Indiana do hereby certify that I hold an unlimited license to practice Medicine in Indiana, that on the 3 day of July, 1978, I did examine Russ Detterline and am of the opinion that he is mentally ill because of Mental confusion & delusions due to chronic alcoholism and cirrohosis of the liver—Also has hypertension and cardiac disease, and furthermore is either dangerous or gravely disabled because Because of his mental confusion he can cause an accident to himself and others, and consequently needs to be committed to V.A. Indiana—Marion, Indiana, for custody, care, and treatment. I affirm

---

1. IC (1983), 16–9.5–1–1 et seq. (Burns Code Ed.)

under the penalties for perjury that the foregoing representations are true to the best of my knowledge, information, and belief." [2]

Although the facts are undisputed that Dr. Bonaventura did not examine or see Detterline on July 3rd, it is disputed when Dr. Bonaventura last saw Detterline as a patient. Detterline contends that he was never a patient of Dr. Bonaventura. However, he did corroborate Dr. Bonaventura's testimony that Dr. Bonaventura took Detterline's blood pressure in the fall of 1977 because Detterline was not feeling well.

The three provisions of the Act which we must consider to determine whether Detterline was a "patient" of Dr. Bonaventura at the time the commitment papers were signed are 16–9.5–1–1(a), 16–9.5–9–2, and 16–9.5–1–1(c):

"16–9.5–1–1. Definitions.—As used in this article:

(a) 'Health care provider' means:

(1) A person, partnership, corporation, professional corporation, facility or institution licensed or legally authorized by this state to provide health care or professional services as a physician, psychiatric hospital, hospital, dentist, registered or licensed practical nurse, optometrist, podiatrist, chiropractor, physical therapist or psychologist, or an officer, employee or agent thereof acting in the course and scope of his employment;"

Detterline admits that Dr. Bonaventura is a health care provider pursuant to the above definition. Before a health care provider can be sued the claimant must comply with 16–9.5–9–2:

"16–9.5–9–2. Prerequisite to suit.—No action against a health care provider may be commenced in any court of this state before the claimant's proposed complaint has been presented to a medical review panel established pursuant to this chapter and an opinion is rendered by the panel. [IC 16–9.5–9–2, as added by Acts 1975, P.L. 146, § 1.]"

The Medical Malpractice Act also defines patient as follows:

"(c) 'Patient' means a natural person who receives or should have received health care from a licensed health care provider, under a contract, express or implied and includes any and all persons having a claim of any kind, whether derivative or otherwise, as a result of alleged malpractice on the part of a health care provider. Derivative claims include, but are not limited to, the claim of a parent or parents, guardian, trustee, child, relative, attorney, or any other representative of such patient including claims for loss of services, loss of consortium, expenses, and all such similar claims."

Detterline contends that because he neither made an express or implied contract for treatment by Dr. Bonaventura he was not a "patient" within the above definition. He asserts that therefore he need not comply with the requirements of 16–9.5–9–2. We disagree.

The purpose of the Act when considered in conjunction with the facts of this case require a determination that Detterline was a "patient" within the scope of the definition of "patient". The purpose of the Medical Malpractice Act was correctly stated in *Warrick Hospital v. Wallace* (1982), Ind.App., 435 N.E.2d 263, 267:

"the Indiana Medical Malpractice Act was enacted to meet the problems of the rapidly escalating cost to physicians of malpractice insurance, the near unavailability of such coverage to physicians engaged in certain high risk specialties, and because '[h]ealth care providers had become fearful of the exposure to malpractice claims and at the same time were unable to obtain adequate malpractice insurance at reasonable prices.' *Johnson v. St. Vincent Hospital, Inc.*, (1980), [273 Ind. 374], 404 N.E.2d 585, 589–90. The legislature thus responded to the vital needs of the community to preserve the

---

**2.** The underlined sections were the blanks which Dr. Bonaventura filled in on a form pro-

vided for Detterline's commitment.

availability of health care services to the citizens of this state. *Id.* The obvious purpose of the Medical Malpractice Act is to provide some measure of protection to health care providers from malpractice claims, thus to preserve the availability of such professional health care services to the community. *Sue Yee Lee v. Lafayette Home Hospital, Inc.,* (1980), Ind. App., 410 N.E.2d 1319, *trans. denied."* *Id.*

Specifically, the Indiana Supreme Court has listed the benefits of first submitting to a medical review panel any claim against a health care provider. *Johnson v. St. Vincent Hospital, Inc.* (1980), 273 Ind. 374, 404 N.E.2d 585, 591–98. It stated that the panel's review was constitutional and encouraged settlements:

"Appellants point out that during the period of time in which the medical review panel is engaged in its functions, the claimant is subjected to the loss of his entire case if the defendant should become unamenable to service of process from a court. Given the maintenance by the Legislature of the malpractice claim and the remedy through the adjudicative process in court, a justification for the imposition of this blanket prohibition must exist if the provision is to be upheld.

As previously concluded the dominant aim of this Act as a whole is to preserve health care services for the community. The delay in instituting suit required by this challenged provision must be reasonable in light of this aim if it is to pass constitutional muster. The delay accommodates the discernment of facts by the medical review panel and the forming of its expert opinion. The participation of the claimant, the insurer, and the health care provider in the panel processes results. Their knowledge and experience so gained will encourage the mediation and settlement of claims and discourage the filing of unreasonably speculative lawsuits. The mental, financial and time-consuming burdens imposed upon health care providers by lawsuits which should have been settled by their insurers or which should "not have been instituted will be lessened, and the disruption of and impairment to their continued vital services reduced. Several factors also are present which would support the general proposition that health care providers are likely to be amenable to process after the panel opinion has been made. Each is licensed or legally authorized by the State to provide health care services, or alternatively, is an agent of the same. Most will be permanent fixtures in the communities where they are located, or maintain a practice or are employed. Individual health care providers will have made significant investments in acquiring their skills and will be dependent upon those skills for their livelihood. Moreover, health care providers and their insurers will have been in contact and will have been present and actively engaged in the panel processes up to the point when the panel is prepared to reach its opinion."

*Id.* 404 N.E.2d at 595.

It is our duty to give effect to the legislative intent as set forth above when we construe a statute. *Marsym Develop. v. Winchester Economic* (1983), Ind.App., 447 N.E.2d 1138, 1143. Moreover, when a court is called upon to construe words in a single section of a statute, it must construe them with due regard for all other sections of the act and with the regard for the legislative intent to carry out the spirit and purpose of the Act. *Park 100 Devel. Co. v. Ind. Dept. of State Rev.* (1981), Ind., 429 N.E.2d 220, 222–23. In addition, we must presume that the legislature intended its language to be applied in a logical manner consistent with the statute's underlying policy and goals. *Common Council of City of Peru v. Peru Daily Tribune, Inc.* (1982), Ind.App., 440 N.E.2d 726, 729; *Frost v. Rev. Bd. of the Ind. Empl. Sec. Div.* (1982), Ind.App., 432 N.E.2d 459, 461.

The facts as applied to IC 16–9.5–1–1(a) and 16–9.5–9–2, show that Detterline should have first submitted his claim against Dr. Bonaventura to a medical re-

view panel. In his request that we interpret the definition of "patient" narrowly, Detterline seemingly asks us to ignore the legislative intent to maintain adequate health care services represented by these two provisions, which define a health care provider and require a review panel decision. This we refuse to do.

Detterline specifically contends that the lack of an express or implied contract keeps him from qualifying as a "patient" thereby relieving him from first obtaining a decision from a medical review panel. In *Gooley v. Moss* (1979), Ind.App., 398 N.E.2d 1314, the court addressed the definition of "patient" in 16–9.5–1–1(c). The *Gooley* case involved a ward of the State who had received a hysterectomy arranged by the Marion County Department of Public Welfare (Department). *Id.* at 1319. The court determined that a contract existed between the Department and the surgeon even though the Department did not have the power to authorize sterlization. *Id.* at 1320. The *Gooley* decision seems to be that although a contract is required for health care services, the person receiving the health care need not be a contractual party. In *Gooley*, the Department acted on behalf of its mentally disabled ward. Similarly, Mrs. Detterline acted in Detterline's behalf when she requested Dr. Bonaventura's signature on Detterline's commitment papers. Dr. Bonaventura provided "health care" as defined in 16–9.5–1–1(i):

"(i) 'Health care' means any act, or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment or confinement."

*See Gooley, supra* at 1320.

Because Dr. Bonaventura signed Detterline's commitment papers in his role as a health care provider and because Mrs. Detterline made a contract with Dr. Bonaventura on Detterline's behalf, Detterline qualified as a "patient" of Dr. Bonaventura as the term is defined in 16–9.5–1–1(c). This determination is consistent with the

legislative intent underlying the other provisions of the Act to provide adequate health care services to the public and to protect physicians from frivolous suits. The question of whether Dr. Bonaventura committed malpractice by signing the commitment papers should have been first submitted to a medical review panel. The trial court correctly dismissed this case for lack of subject matter jurisdiction.

Affirmed.

HOFFMAN and GARRARD, JJ., concur.