Mark A. FAVER and Rodney DeHart individually and as representatives of all similarly situated individuals, Appellants–Plaintiffs,

v.

Evan BAYH, in his official capacity as Governor of the State of Indiana, John Nunn, in his individual and official capacity as Senior Deputy Commissioner in charge of Operations, Christopher De-Bruyn, in his individual and official capacity as Commissioner of the Indiana Department of Correction, Norman G. Owens, in his individual and official capacity as Director of the Classification Division of the Indiana Department of Correction, D. Bruce Jordan, in his individual and official capacity as Superintendent of the Indiana State Farm, and Richard Zuel, in his individual and official capacity as Unit Team Manager of the protective custody unit of the Indiana State Farm, Appellees–Defendants.

No. 67A01–9607–CV–220.

Court of Appeals of Indiana.

Dec. 10, 1997.

Kenneth J. Falk, Indiana Civil Liberties Union Indianapolis, for Appellants–Plaintiffs.

Jeffrey A. Modisett, Attorney General, David A. Arthur, Deputy Attorney General, Indianapolis, for Appellees–Defendants.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Mark A. Faver and Rodney DeHart ("Prisoners"), inmates at the Indiana State Farm,[1] filed a complaint against Governor Evan Bayh, in his official capacity, and John Nunn, Christopher DeBruyn, Norman Owens, Bruce Jordan and Richard Zuel, in their individual and representative capacities (collectively "the State"), and alleged that inmates housed in the Protective Custody Unit ("PCU") of the Indiana State Farm were treated differently from inmates in the general population in violation of the United States Constitution, the Indiana Constitution and several Indiana statutes. The trial court certified the case as a class action pursuant to Indiana Trial Rule 23(B).[2] Most of the Prisoners' claims were settled prior to trial. After a two-day bench trial, the trial court decided the remaining claims in favor of the State and entered special findings after the

---

1. After the complaint was filed, the Indiana State Farm was renamed the Putnamville Correctional Facility pursuant to P.L. 12–1996.

2. The class consists of "all present and future prisoners, since the date the complaint was filed in this matter, who are subject to protective custody confinement and the protective custody program/policies of the Indiana State Farm, located in Putnamville, Indiana."

State made an oral request. Prisoners now appeal.

We reverse.[3]

## ISSUES

Prisoners present several issues for review[4] which we consolidate and restate as:

1. Whether the trial court erred when it concluded that the denial of "idle pay" to PCU inmates does not violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

2. Whether the trial court erred when it concluded that the State had complied with Indiana Code § 11-10-5-1 which requires the State to provide educational programs to prisoners.

## FACTS

The Indiana State Farm, located in Putnamville, is a men's prison which houses approximately 1,635 offenders. Prisoners at the facility are housed in either general population, disciplinary segregation, administrative segregation, admission and orientation or protective custody units. The plaintiffs in this case are those prisoners subject to protective custody.

Prisoners in PCU generally number between twenty and thirty inmates at any one time. Admission to PCU may be either voluntary or involuntary. When a prisoner requests admission to PCU, correctional staff must verify the need for protective custody before admitting the offender.[5] After admit-tance, the staff monitors the inmate's status to determine whether he can be returned safely to the general population. Although PCU is designed as a temporary housing unit, an inmate can remain there for years.

As a consequence of security concerns and the persistent view that PCU is temporary, PCU inmates do not receive the same services as inmates in the general population. For example, inmates in the general population at the State Farm receive "state pay" of $0.65 per day for participation in employment, education or vocational programs. The Indiana State Farm Handbook '94 provides that "state pay" is earned only by inmates who are assigned to a work line or in Administrative Segregation (excluding PCU). Nevertheless, the Indiana State Farm has a de facto policy that general population inmates and inmates involuntarily placed in PCU who do not participate in these programs receive "state pay." This payment, referred to as "idle pay," is intended to compensate inmates who cannot work due to an insufficient number of employment opportunities at the facility. However, the Operational Procedures for Policy 02-01-107, The Use and Operation of Protective Custody, § VI(Q), (effective Dec. 6, 1994) specifically denies such pay to inmates voluntarily admitted to PCU.[6]

In addition, PCU inmates have not been allowed to participate in the education programs that are offered to the general population.[7] Participation in most educational pro-

<hr/>

3. Oral argument was heard on October 8, 1997, at Vincennes University. At oral argument, the parties stipulated that subsequent to the trial court's judgment the State has provided "idle pay" and some GED programming to PCU inmates. However, the parties agreed that this did not affect the merits of the appeal since the State was not obligated to continue these practices.

4. At oral argument, Prisoners dropped their free exercise of religion claim because the Religious Freedom Restoration Act on which they had relied was declared unconstitutional. *See City of Boerne v. Flores,* —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

5. A prisoner requires protective custody when he has a reason to fear for his safety if left in the general population. Prisoners who enter PCU voluntarily often do so because they have become indebted to other offenders or have problems, usually drug related, with other offenders.

6. Counsel for Appellants is reminded that Indiana Appellate Rule 7.1(A) requires that all pages in the record be consecutively numbered, including each page in multi-page exhibits and depositions.

7. Educational programs are only available to those inmates in the general population who are eligible based on their classification within the prison system. There are currently about 150 general population inmates who are waiting for space to become available in the education program because all classes are full and available teacher time is utilized by the current participants.

grams requires the inmate to attend classes held in the education building where teachers and peer tutors are available for assistance. However, PCU inmates are denied access to the education building for security reasons. General population inmates are also allowed to enroll in correspondence courses. Institutional involvement with correspondence courses consists of assistance with the completion of application forms. At trial, Prisoners presented evidence that video courses, which can be utilized without the aid of teachers or tutors, are available for purchase by the Department of Correction. Prison officials testified that correspondence and video courses could be offered to PCU inmates without creating security concerns.

## DISCUSSION AND DECISION

### Standard of Review

 When a party has requested specific findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A), the reviewing court cannot affirm the judgment on any legal basis. *Vanderburgh County Bd. of Comm'rs v. Rittenhouse*, 575 N.E.2d 663, 665 (Ind.Ct.App.1991), *trans. denied*. Rather, this Court must first determine whether the evidence supports the findings and second, whether the findings support the judgment. *Id.* The judgment will be reversed only when clearly erroneous. *DeHaan v. DeHaan*, 572 N.E.2d 1315, 1320 (Ind.Ct.App. 1991), *trans. denied*. Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. *Id.* To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inference flowing therefrom, and we will not reweigh the evidence or assess witness credibility. *Id.*

 Here, the State made an oral request for special findings, which does not invoke Indiana Trial Rule 52(A). *See D.A.X., Inc. v. Employers Ins. of Wausau*, 659 N.E.2d 1150, 1155 (Ind.Ct.App.1996), *trans. denied*. Such findings are treated as if they were entered sua sponte. *See id.* When the trial court enters specific findings sua sponte,

the findings control only as to the issues they cover, while a general judgment standard applies to any issue upon which the court has not found. *In re Marriage of Snemis*, 575 N.E.2d 650, 652 (Ind.Ct.App.1991). We may affirm a general judgment on any theory supported by the evidence adduced at trial. *Id.*

### "Idle Pay"

Prisoners do not contend that offenders have a constitutional right to receive "idle pay." Instead, Prisoners contend that voluntary PCU inmates are denied equal protection under the Fourteenth Amendment to the United States Constitution because the State denies "idle pay" to them while providing such pay to other similarly situated offenders. The State counters that Prisoners do not have an equal protection claim to "idle pay" because the general population has received such pay contrary to Department of Correction policy.

 Convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282, 289 (1987). However, lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. *Id.* Constitutional rights of prisoners are limited by the fact of incarceration and valid penological objectives, including deterrence of crime, rehabilitation of prisoners, and institutional security. *Id.*, at 348, 107 S.Ct. at 2404, 96 L.Ed.2d at 290.

 When a prison regulation impinges on an inmate's constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests and does not represent an exaggerated response to those concerns. *Turner v. Safley*, 482 U.S. 78, 87, 107 S.Ct. 2254, 2260–2261, 96 L.Ed.2d 64, 78–79 (1987). To evaluate a challenged regulation, the court should consider the following factors:

(1) whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule;

(2) whether there are alternative means of exercising the right in question that remain available to prisoners; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and the allocation of prison resources; and (4) although the regulation need not satisfy the least restrictive alternative test, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable.

*Hendrix v. Evans,* 715 F.Supp. 897, 902 (N.D.Ind.1989) (citing *Turner*) *aff'd* 972 F.2d 351 (7th Cir.1992). In addition, an inmate must show that the discrimination against him was intentional or deliberate to succeed on an equal protection claim. *Douglas v. DeBruyn,* 936 F.Supp. 572, 576 (S.D. Indiana 1996).

An examination of the record confirms that general population inmates and inmates involuntarily admitted to PCU receive "idle pay" while inmates voluntarily in PCU do not. The trial court entered two findings on this issue:

> 27. Protective custody offenders who have job assignments are paid.
>
> 28. For those who are indigent, basic hygiene items are provided. There is no evidence that any offender was deprived of necessary items due to lack of money to purchase it.

The court then concluded that "[t]he law is with the Defendants and against the Plaintiff Class and the Plaintiff Class is entitled to no relief in this case." We disagree with that conclusion.

The State advances only one reason for the denial of "idle pay" to voluntary PCU inmates. The State claims that inmates in the general population are receiving "idle pay" contrary to Department of Correction policy and that the error should not be compounded by including voluntary PCU inmates. However, the State's argument is belied by the

clear statement in the Operational Procedures for Policy 02–01–107, The Use and Operation of Protective Custody, § VI(Q), that PCU offenders will not receive "state pay" unless the offender actually works or is "involuntarily assigned to PCU." The wording of this statement makes it clear that involuntary PCU inmates receive "idle pay."

■ Although, the State has a legitimate government interest in withholding "state pay" from inmates who do not work or participate in education or vocational programs, the State has failed to demonstrate a legitimate penological interest in providing such pay to some but not all inmates. The $0.65 per day for approximately thirty prisoners in PCU would neither place a financial strain on the prison nor have more than a negligible impact on the allocation of prison resources. Further, "idle pay" is the only source of income for prisoners who cannot work because of the security restraints of PCU.[8] Finally, the State's written policy, which specifically provides for state pay to involuntary PCU inmates and those who work, along with the de facto policy which provides such pay to the general population, demonstrates that the State's denial was deliberate. Based on a consideration of these factors, we hold that the trial court's conclusion that the law was in favor of the Defendants and against the Plaintiffs was clearly erroneous. Therefore, we hold that voluntary PCU inmates are entitled to receive "idle pay" to the same extent that it is provided to the general population and to those inmates involuntarily committed to PCU.[9]

### Education Programs

At trial, Prisoners requested access to the same education programs offered at the Indiana State Farm to inmates in the general population. The State countered that the provision of education programs to PCU inmates would result in security problems and

---

8. This income is necessary because many prisoners have no other source of income and current policy requires inmates to pay for their own over-the-counter drugs, such as aspirin and acetaminophen, and purchase basic hygiene items other than soap and toothpaste.

9. We express no opinion as to whether inmates have a constitutional right to receive "idle pay."

the diversion of scarce penological resources from the greater number of general population offenders. However, at oral argument Prisoners conceded that their need to be separated from the general population for their own safety precludes their participation in classes taught in the education building and that to assign a teacher to the PCU dormitory would divert scarce resources from the greater number of general population offenders. Thus, Prisoners have limited their request for relief to participation in video and correspondence courses which can be taken without the aid of teachers or tutors. Prisoners contend that the denial of these types of courses violates several sections of Title 11 of the Indiana Code, while the State maintains that security concerns and scarce resources justify the denial.[10] The trial court did not make any findings of fact relevant to this narrow issue. However, the court did make the following conclusions:

24. Plaintiff's have failed to prove any violation of Title 11 of the Indiana Code.

\* \* \* \* \* \*

27. The Statutes do not mandate that each offender must actually be receiving or have access to each program or service or that the program or service be immediately available to each and every offender but that the programs and services must be available to those who can take advantage of them and who are qualified. As to each program the statutory mandate is that the department "implement" (Indiana Code § 11–10–5–1) or "establish, maintain and operate" (Indiana Code § 11–10–6–2) the designated program or service or that the department classify offenders. Ind.Code 11–10–1–3(b). *None of these statutes creates any obligation on the department to provide each program or service to each offender and none creates a right on the part of an offender to gain access to the program or service.*

\* \* \* \* \* \*

29. Because each of these programs is available at the Indiana State Farm there is no violation of any of the cited statutes.

(Emphasis added).

A statute should be construed so as to ascertain and give effect to the intention of the legislature as expressed in the statute. *State v. Windy City Fireworks, Inc.,* 600 N.E.2d 555, 558 (Ind.Ct.App.1992), *adopted on transfer,* 608 N.E.2d 699 (Ind.1993). In so doing, the objectives and purposes of the statute in question must be considered as well as the effect and consequences of such interpretation. *Id.* When interpreting the words of a single section, this court must construe those words with due regard for all other sections in the act and with regard for the legislative intent to carry out the spirit and purpose of the act. *Detterline v. Bonaventura,* 465 N.E.2d 215, 218 (Ind.Ct.App. 1984), *trans. denied.* We presume that the legislature intended its language to be applied in a logical manner consistent with the statute's underlying policy and goals. *Id.* Additionally, we presume that words appearing in the statute were intended to have meaning, and we endeavor to give those words their plain and ordinary meaning absent a clearly manifested purpose to do otherwise. *Indiana Dept. of Human Services v. Firth,* 590 N.E.2d 154, 157 (Ind.Ct.App.1992), *trans. denied.*

The trial court cited several sections from Title 11 of the Indiana Code. Indiana Code § 11–10–1–3 provides:

After determining the offender's security classification, *the department shall assign him to a facility* or program; make an initial employment, education, training or other assignment within that facility or program; and order medical, psychiatric, psychological, or other services. In making the assignment, the department shall, in addition to other relevant information, consider: (1) the results of the evaluation prescribed in section 2 of this chapter; (2) the offenders security classification; (3)

---

**10.** We decline to address Prisoners' education claims under the state and federal constitutions since Prisoners have an adequate statutory remedy. *See Bayh v. Sonnenburg,* 573 N.E.2d 398, 402 (Ind.1991) ("It is the duty of the court not to enter upon the consideration of a constitutional question where the court can perceive another ground on which it may properly rest its decision."), *cert. denied.*

*the offenders need for special therapy or programs, including employment, education, or training available only in specific facilities ....*

IND.CODE § 11–10–1–3(b)(1), (2), (3) (emphasis added). Indiana Code § 11–10–5–1 states:

*The department shall,* after consulting with the state superintendent of public instruction and the Indiana commission on vocational and technical education of the department of workforce development, *implement academic and vocational education curricula and programs for confined offenders,* by utilizing qualified personnel employed by the department or by arranging for instruction to be given by public or private educational agencies in Indiana. The department *shall include special education programs,* which shall be governed under IC 20–1–6–2.1. To provide funding for the development and implementation of academic and vocational education curricula and programs, *the department may accept gifts and apply for and receive grants from any source.*

(emphasis added). Finally, Indiana Code § 11–10–6–2 provides in relevant part:

*The department shall establish, maintain, and operate industry and farm programs for offenders* designed to equip the participant with a marketable skill which will provide to him a means of earning a livelihood upon his return to the community.

(emphasis added). Prisoners argue that the State has no discretion under these statutes to deny PCU inmates access to some form of education program. The State counters that these statutes only require that the State make educational programs available at the facility, not that they be made available to every prisoner.

■ The importance the legislature places on providing education programs to offenders can be seen by reading the act as a whole. First, the purpose of Indiana Code § 11–10–5–1 is to provide education and vo-

cational programs to offenders. This same provision authorizes the Department to obtain funding for education programs from sources independent of the State not found in other provisions in the act.[11] The legislature has also directed the Department to consider the educational opportunities at the facility as a factor in assigning a prisoner to a particular facility. *See* IND.CODE § 11–10–1–3(b)(3).

Further, all of the above statutes contain the word "shall." The plain and ordinary meaning of "shall" is "must," a term which is inconsistent with the exercise of discretion. BLACK'S LAW DICTIONARY 1375 (6th ed.1990). Thus, the State must provide education programs to offenders, but the question remains whether all "confined offenders" are entitled to participate in some form of education program.

■ While certain provisions of Title 11 grant discretion to the Department, others do not. In contrast to the statutes previously set forth, Indiana Code § 11–10–11–1 is prefaced with the words:

(a) *To the greatest extent possible,* consistent with the security of the facilities and programs and departmental resources, *the department shall establish recreational and cultural programs* and activities designed to develop and maintain the physical and mental health of confined persons.

IND.CODE § 11–10–11–1(a), (emphasis added). Similar words of discretion are not found in Indiana Code § 11–10–5–1, which provides for the implementation and funding of education programs. While we agree with the trial court's determination that Indiana Code § 11–10–5–1 does not impose an obligation on the Department to provide each program to each offender, or a right on the part of an offender to gain access to each program, we hold that the statute mandates that the Department of Correction provide access to some form of education program to all "confined offenders."[12] Thus, we conclude that

---

11. Contrast this provision with Indiana Code § 11–10–11–1 which limits recreational funding to the funds available in Department's budget as indicated by the language "consistent with ...

departmental resources." IND.CODE § 11–10–11–1(a).

12. We can conceive of circumstances in which the State might deny access to educational pro-

the State violated Title 11 of the Indiana Code by denying education programs to PCU inmates.

Reversed.

ROBERTSON and BAKER, JJ., concur.

grams based on security or disciplinary concerns, but such concerns are not implicated by the limited request for correspondence and video courses in the present case.