Charles W. CARROLL and Patrick D. Carroll, Co–Personal Representatives of the Estate of Gertrude E. Carroll, Deceased, Appellants–Plaintiffs,

v.

J.J.B. HILLIARD, W.L. LYONS, INC. and R. Dale Cassiday, Appellees–Defendants.

No. 49A04–9910–CV–468.

Court of Appeals of Indiana.

Nov. 22, 2000.

Donald J. Tribbett, Scott L. Starr, Starr Austen Tribbett & Meyers, Logansport, Indiana, Attorneys for Appellants.

Robert P. Johnstone, Stanley C. Fickle, Barnes & Thornburg, Indianapolis, Indiana, Attorneys for Appellees.

## OPINION

FRIEDLANDER, Judge

On February 2, 1990, Gertrude E. Carroll filed a two-count complaint alleging common-law fraud and a violation Ind. Code Ann. § 23–2 *et seq.*, the Indiana Securities Act (the Securities Act), against J.J.B. Hilliard, W.L. Lyons, Inc. (Hilliard Lyons), a stock brokerage firm, and R. Dale Cassiday, who was employed as a broker by Hilliard Lyons. A second, three-count, amended complaint was filed on March 23,1998. The allegations in the second amended complaint remained basically unchanged from those in the original complaint, and centered upon investment services provided by Cassiday on Carroll's behalf in 1986. Carroll died on February 9, 1998, after this action was filed but before it was brought to trial. Her sons, Charles W. Carroll and Patrick D. Carroll, were appointed as personal representatives of Carroll's estate (the Estate) and were substituted as party plaintiffs following her death. The matter proceeded to a trial before the court in May of 1999 and the court rendered a judgment in favor of the defendants. The following restated issues are dispositive in this appeal:

1. Did the manner in which Cassiday presented his investment recommendations to Carroll violate the Indiana Securities Act?

2. Did Cassiday violate the Indiana Securities Act by failing to inform Carroll that the period required to recover the costs of the recommended transactions was roughly equal to her life expectancy?

3. Did Cassiday violate the Indiana Securities Act by providing Carroll with allegedly false information and by failing to accurately inform Carroll of the tax implications of the plan he recommended to her?

We affirm.

The facts favorable to the judgment are that Carroll contacted Cassiday in July, 1986 at the recommendation of a friend. At the time, Carroll was seventy-five years old. Although she did not possess the financial sophistication of a stockbroker, Carroll was capable of handling her finan-

cial affairs and was more knowledgeable than others about her investments. At the time that she contacted Cassiday, she owned certificates of deposits (CDs) and a diversified investment portfolio that included common and preferred stocks, tax-exempt bonds, and mutual funds. Carroll, who had dealt with other stockbrokers before she contacted Cassiday, retained Cassiday's services throughout the remainder of 1986. She terminated the relationship in late 1986 upon the advice of her son, Patrick. The allegations contained in the complaint center upon several specific aspects of the financial services rendered by Cassiday. We set forth below the pertinent facts of that representation.

Cassiday initially met with Carroll in her home on August 17, 1986. At that time, Cassiday took notes as Carroll explained in detail the nature of her portfolio. Her assets included eight common stocks and four preferred stocks that, combined, constituted thirty-eight percent of Carroll's net worth. Carroll had owned these stocks for a considerable period of time. During the time that she owned them, the stocks increased in value from $26,937.00 to $125,984.00. Carroll indicated to Cassiday at the meeting that the main goal she sought to achieve through his services was an increased and steady "useable cash flow." *Record* at 1132.

After the meeting, Cassiday prepared a detailed, five-page memo. Included in the memo was a list of the stocks in Carroll's then-existing portfolio. With regard to each stock, Cassiday's memo listed the number of shares owned, the value, the dividend paid, the dividend yield, and the income generated. The memo also contained an analysis of the investments that Cassiday would recommend to Carroll.

Cassiday and Carroll met again on August 25, 1986, at which time Cassiday presented his recommendations to Carroll and gave her a copy of his five-page memo. At the second meeting, Cassiday explained to Carroll that her objectives could not be attained solely through interest and divi-

dend income, except through strategies incorporating an unacceptably high increase in risk. He therefore recommended that she utilize a strategy known as a systematic withdrawal program.

Systematic withdrawal programs have been utilized since at least 1950. Under such a program, Carroll's money would be invested primarily in mutual funds. Thereafter, Carroll would make systematic monthly withdrawals from the funds, the combined total of which would equal about ten percent of the total fund per year. Under this strategy, the desired result is that the yearly return on the fund's investments would exceed the amount withdrawn annually. He also explained one risk of a systematic withdrawal program: if the total return of her investments fell below ten percent, then withdrawal at a ten-percent rate would invade principal.

In this particular case, Cassiday recommended that Carroll participate in, among others, the Kemper Total Return Fund (the Kemper Fund) and the Putnam High Income Government Fund (the Putnam Fund). He informed Carroll that the Kemper Fund's total return had averaged 22.11% during the preceding 10 years, and was 17.62% during 1986. Cassiday specifically recommended that Carroll invest $75,000.00 in the Kemper Fund and $25,000.00 in the Putnam Fund. Carroll decided, however, that she wanted to invest $80,000.00 in the Kemper Fund and $30,000.00 in the Putnam Fund.

In order to create a pool of money with which to purchase these investments, Cassiday recommended that Carroll sell eight of her existing stocks. He informed Carroll that such would trigger capital gains tax liability. He estimated she would incur approximately $9,985.00 in capital gains tax liability. He suggested that she create a cash reserve to cover that liability. Carroll was concerned about the tax liability and asked Cassiday to call her accountant, Jim Winemiller, and advise him of the situation. Cassiday recorded Winemil-

ler's name, firm, and telephone number on his notes. Cassiday later called Winemiller and told him of the proposed transactions, and also told Winemiller that in his (Cassiday's) opinion, the capital gains tax liability would be significant.

After Carroll gave her authorization, Cassiday began selling her portfolio on September 2, 1986. Carroll received $127,000.00 from the sale of her entire portfolio. With those funds, and utilizing additional proceeds she realized after liquidating some certificates of deposit she owned, Carroll purchased a new portfolio for $155,000 .00. The new portfolio consisted of two mutual funds and seven common stocks. As a result of selling her old portfolio and purchasing the stocks and mutual funds recommended by Cassiday, Carroll paid the appellees $7,571.00 in brokerage fees. In addition, Carroll incurred capital gains tax liability in the amount of $16,615.00.

By December 1986, Patrick Carroll advised his mother that she should no longer "do business" with Cassiday, and she terminated the appellees' services. *Record* at 1162. In March 1987, Carroll reviewed an income tax return prepared by her accountant and discovered that the tax liability on the capital gains realized as a result of the sale of her former stock holdings was 50 % higher than Cassiday had estimated. She contacted her sons and an attorney and asked them to investigate whether Cassiday had defrauded her or had violated securities laws. On February 2, 1990, Carroll filed suit against Hilliard Lyons and Cassiday, alleging common-law fraud and violations of securities regulations. Following a three-day bench trial, the court returned a verdict for the defendants. The court's decision was supported by the following findings of fact.

5. At the second meeting, Cassiday also reviewed with her the first five pages of plaintiff's Exhibit 3. He explained the detailed information with respect to each of her current investments. He explained to her that if she sold those investments, she would incur a tax liability for capital gains and he suggested that she establish a reserve in anticipation of those capital gains. His rough estimate of the amount of capital gains which she would incur at her tax bracket was $9,895. He told her that he was not an accountant and was not computing her taxes. At the meeting, he explained a number of investment options to her, including the Kemper Total Return Fund and the Putnam High Government Fund. During the meeting, Mrs. Carroll asked Cassiday to call her accountant, Jim Winemiller, to tell him that she would be selling stocks. Cassiday agreed to do so and wrote down Mr. Winemiller's name, firm, and telephone number at the end of the five pages of notes.

6. An account for Mrs. Carroll at Hilliard Lyons was opened after the second meeting. On September 2, 1986, a number of stocks owned by Mrs. Carroll were sold through Hilliard Lyons at Mrs. Carroll's direction.

7. On September 4, Mrs. Carroll purchased shares of Kemper Total Return Fund for $80,012.54 and shares of Putnam High Government Trust for $30,011.34. Cassiday had recommended the Putnam High Government Fund to Mrs. Carroll because she was familiar with that family of funds and this appeared to be a reasonable choice of an investment to achieve a 10% yield. The Kemper Fund was set up for systematic withdrawal of $650 a month. The Putnam High Government Fund was set up to pay interest dividends to Mrs. Carroll.

8. In September of 1986, at Mrs. Carroll's request, Cassiday prepared a list of stocks which could provide income and/or appreciation for Mrs. Carroll to consider. Mrs. Carroll followed some of those recommendations. On September 29, 1986, Mrs. Carroll purchased shares of Arvin, Circle Income Shares, Illinois Power, Philadelphia Electric, Texaco,

and Royce Value Trust. In December, she sold shares of Indiana Energy with the expectation that proceeds from that sale would be invested in a mutual fund. That expectation did not come about because she stopped doing business with Cassiday and Hilliard Lyons at the direction of her son, plaintiff Patrick D. Carroll. She did not buy or sell any investments through Cassiday or Hilliard Lyons after December 1986.

9. With respect to those investments which Mrs. Carroll sold during 1986, each of those sales was made through public stock exchanges. There was no evidence that either defendant purchased any investment from her.

10. Although there was disputed evidence with respect to whether Cassiday called Mrs. Carroll's accountant, the Court finds that Cassiday did in all probability make that telephone call and did inform her accountant that Mrs. Carroll was selling a number of investments. In response, the accountant told Cassiday that the information which would be provided to Mrs. Carroll by Hilliard Lyons would be sufficient for the accountant's needs in completing tax matters for Mrs. Carroll.

11. Even if the Court had found otherwise, the accountant's testimony showed that his advice would not have stopped Mrs. Carroll from selling stock in 1986 and incurring capital gains liability. The accountant testified that he believed that he talked with Mrs. Carroll on September 3, 1986 about the sales which she had made the previous day. She was concerned about her estimated tax payment which was due on September 15 and asked if it needed to be increased because she had sold stock. In response, the accountant told Mrs. Carroll that she did not need to increase her September estimated tax payment. The accountant also testified that during the telephone call, Mrs. Carroll expressed concern about incurring capital gains liability. However, the evidence shows that even after expressing concern about her tax liability and speaking with her accountant, Mrs. Carroll continued to sell stock in December of 1986. Mrs. Carroll's 1986 tax return (Exhibit 9), showed that even after she talked with the accountant on September 3 about the sales and capital gains liability, she incurred additional tax liability for two more transactions in December 1986. The accountant confirmed that on one of those transactions, Mrs. Carroll had a taxable gain in excess of $15,700 from her sale of Indiana Energy stock on December 19. She made the sale in December without contacting him again and without requesting any further tax advice.

12. Beginning in 1987, Mrs. Carroll sold a number of the investments recommended by Cassiday. In May or 1987, she sold her shares of stock in Shelby Federal Savings. Her sons, now plaintiffs in this action, recommended that sale. She incurred a small loss on that sale. If that stock had been retained, it would have been converted into stock of National City Corporation and would have a substantial value today. Similarly, in August of 1987, she sold her shares of Texaco at the recommendation of her son, plaintiff Patrick Carroll. She incurred a gain of approximately $1,800. If that sale had not been made, and the stock had been retained, in May of 1999, it would have been worth in excess of $40,000. At the recommendation of her sons, Mrs. Carroll also sold her shares in Arvin Industries and Royce Value Trust, Inc.

13. In 1991, Mrs. Carroll sold her shares in Kemper Total Return Fund at the recommendation of her son, Patrick Carroll. If her shares in that fund had been retained and the fund had continued to make the systematic withdrawal payments to Mrs. Carroll during her life, the total return of the fund would have covered the amount of the systematic withdrawals and her investment would have appreciated in value. That

fund was an appropriate investment for Mrs. Carroll's objective and, if not sold, would have performed in accordance with the original recommendation.

14. Mrs. Carroll retained the shares of Illinova, PECO, and Circle Income until her death and those shares are currently in her estate. She retained those stocks because her son was advising her to take a "wait-and-see-attitude." Similarly, her son advised her to take a "wait-and-see attitude" with respect to the shares of Putnam High Government Fund which she retained until her death. Those shares remain in her estate. In 1986, the year the investment was made, the Putnam High Government Fund had a total return in excess of 14% and paid an income dividend in excess of 10%.

15. Defendants did not exercise control over Mrs. Carroll's brokerage account. Recommendations were made to her, and she authorized the sales and purchases during the five months that she dealt with defendants.

16. Mrs. Carroll had some experience as an investor before she did business with defendants and had accumulated a substantial diversified portfolio. It appears that she was capable of handling her affairs in 1986 and did so throughout the time that she dealt with defendants.

17. Defendants provided Mrs. Carroll with accurate information about the investments which she held in August of 1986. They did not misrepresent any facts to her, make any untrue statements, or omit any material facts in their explanations to her regarding either the sale of purchase of investments.

*Record* at 187–191 (some citations omitted). Based upon the foregoing findings of fact, the trial court determined that Hilliard Lyons and Cassiday were not liable to the Estate because they did not violate the Securities Act and did not commit fraud or constructive fraud.

We note at the outset that the Estate appeals from a negative judgment following a bench trial. Our standard of review in such cases is well settled. When, as here, the trial court entered findings of fact and conclusions of law, we apply a two-tiered standard of review. *Western Ohio Pizza, Inc. v. Clark Oil & Ref. Corp.*, 704 N.E.2d 1086 (Ind.Ct.App. 1999), *trans. denied.* We first determine whether the evidence supports the findings, and then whether the findings support the judgment. *Id.* We will set aside the trial court's findings and conclusions only if they are clearly erroneous. Findings are clearly erroneous if the record contains no facts or inferences supporting them. *Id.* A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made.

We note also that the trial court entered findings upon an oral motion submitted by the parties. An oral request for special findings does not invoke Indiana Trial Rule 52(A). *Faver v. Bayh*, 689 N.E.2d 727 (Ind.Ct.App.1997). Such findings are treated as if they were entered sua sponte. *Id.* Sua sponte findings control only as to the issues they cover and a general judgment will control as to the issues upon which there are no findings. *Yanoff v. Muncy*, 688 N.E.2d 1259 (Ind. 1997). A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.* In applying these standards, we consider only the evidence most favorable to the judgment and we neither reweigh evidence nor judge witness credibility. *Catellier v. Depco, Inc.*, 696 N.E.2d 75 (Ind.Ct.App.1998).

### 1.

The Estate contends that the trial court erred in concluding that the appellees did not violate the Securities Act.

In actions alleging violation of the Securities Act, the plaintiff bears the burden of proving that the defendant engaged in one of the enumerated acts prohibited

by IC § 23–2–1–12. *See Kirchoff v. Selby,* 703 N.E.2d 644 (Ind.1998). IC § 23–2–1–12 prohibits (1) employing any device, scheme or artifice to defraud, (2) making untrue statements of material fact or misleading by failing to state material facts, or (3) engaging in an act, practice or course of business that operates as a fraud or deceit upon any person.

The Estate contends that Cassiday's presentation of his recommendations to Carroll at their second meeting violated the Securities Act. According to the Estate, "the presentation was, as a matter of law, illegal[.]" Appellant's Brief at 16. This claim is based upon the contentions that the presentation was confusing, and that the presentation violated Ind. Administrative Code § 1–17–1(d), which states:

> Sec. 1. Dishonest and unethical practices within the meaning of IC § 23–2–1–11 shall include but not be limited to the following:
>
> \* \* \* \* \*
>
> (d) Representations Concerning Investment Return. Representing or implying in the offer or sale of securities a return on an investment based on figures which combine income and distributions from capital or any other source.

 According to the Estate, Cassiday's presentation violated the above regulation in that it did not specify with sufficient clarity that the money withdrawn on a monthly basis under the systematic withdrawal plan might consist of principal in addition to dividends. Moreover, the Estate seems to imply that, even assuming Cassiday explained to Carroll that she may, under certain circumstances, have to invade principal in order to take her monthly withdrawal, the monthly withdrawal program itself was in violation of 710 IAC § 1–17–1(d).

With respect to the first contention, it is true that the handwritten document Cassiday gave to Carroll in conjunction with his presentation did not specify that under certain circumstances the monthly withdrawal might include principal. Cassiday testified, however, that he explained that aspect of the systematic withdrawal plan to Carroll at the meeting. It was within the trial court's province to believe Cassiday's testimony in that regard.[1] *See Catellier v. Depco, Inc.,* 696 N.E.2d 75.

The Estate contends that even if Cassiday verbally explained the potential sources from which the monthly withdrawal might derive, Cassiday's presentation was so confusing in that regard that "only the most sophisticated investor could possibly fathom that, under such a plan, the investor could possibly lose principal in order to fulfill his desire for more 'income.'" Appellant's Brief at 15. The Estate argues that the confusion thus engendered is the "very problem" to which 710 IAC § 1–17–1(d) is addressed.

 We cannot agree with the Estate's contentions with respect to its focus. The Estate contends that subsection (d) focuses upon the sources of investment returns, seemingly implying that a broker may not represent that returns would equal a certain amount, when said amount included both dividend and principal. We do not view subsection (d) as prohibiting a distribution of capital that is comprised of both dividends and withdrawal of principal. If such were the case, subsection (e) of 710 IAC § 1–17–1 would be moot. Subsection (e) prohibits "[r]epresenting or implying in the offer or sale of securities distributions from capital, depreciation, or similar distributions and *failing to point out that such distributions reduce the value of the investment.*" (Emphasis supplied.) Moreover, we do not read subsection (d) to prohibit presentations that are confusing, which is the only other possible basis for

---

1. We note here that the Estate does not contend that Cassiday was required to reduce his presentation to writing.

liability we can discern with respect to this particular argument.

■ We think the better interpretation is that subsection (d) addresses Ponzi schemes. A Ponzi scheme is a type of fraud involving a series of investors in which the resources of later investors are used to fund obligations to earlier investors, resulting in a pyramiding of liabilities of the investment enterprise. *Chosnek v. Rolley*, 688 N.E.2d 202 (Ind.Ct.App.1997). In our view, the primary purpose of subsection (d) is to prohibit brokers from representing a return on an investment that includes an infusion of capital supplied by later investors in the program in question.

■ In summary, there was evidence to support the finding that, during his presentation, Cassiday informed Carroll that her monthly withdrawals might include principal from her investments in the event that she did not realize a ten-percent return on her investments. We further conclude that Cassiday's presentation did not violate subsection (d), which is directed primarily at prohibiting Ponzi schemes, because subsection (d) does not address the general nature or quality of presentations made by brokers, and does not prohibit investment programs that mix principal and dividends in monthly returns.

## 2.

■ The Estate contends that Cassiday violated IC § 23–2–1–12 by failing to inform Carroll that the period required to recover the transactional costs was roughly equivalent to her life expectancy.

■ According to the Securities Act, in connection with an offer, sale or purchase of any security, an individual may not "omit to state a material fact necessary in order to make the statements made in the light of circumstances under which they are made, not misleading . . . ." IC § 23–2–1–12(2). This court has indicated that omitted information is "material" within

the meaning of IC § 23–2–1–12 if it "is relevant to the investment decision." *Manns v. Skolnik*, 666 N.E.2d 1236, 1249 (Ind.Ct.App.1996), *trans. denied.* Moreover, we have approved the use of an objective test for determining the materiality of information to a transaction. *See id.* Under this test, we must determine whether a reasonable purchaser would consider the omitted fact material. In order to be material in this context, "[t]here must be a substantial likelihood that the disclosure of the [misstatement or the] omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information made available." *Id.* at 1251 n. 8 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

The evidence favorable to the judgment reveals that Carroll expressed to Cassiday that income, not growth, was the most important consideration in determining which investment strategy to employ. Cassiday advised Carroll that a systematic withdrawal program might best achieve that end. He then explained to Carroll how such a program operated, and listed for Carroll the attendant risks and benefits of a systematic withdrawal program. After reviewing the evidence favorable to the judgment, we are not convinced that there is a substantial likelihood that a reasonable investor of Carroll's age, whose primary goal was increasing her income, would have viewed the omitted information as significantly altering the total mix of the information available to her at the time. *See id.*

We note in this regard that the appellees presented the expert testimony of George Donald Steele, president of Planned Investment Company, a locally based broker dealer. Steele testified that an analysis focusing upon the time required to recover Carroll's transactional costs would not have been relevant to the

primary goal which Cassiday was asked to achieve, *i.e.*, increase Carroll's monthly cash flow. Steele testified that neither he nor any member of his firm would perform such an analysis for a client whose focus was shifting from growth to income. Finally, Steele clarified that there was not then and is not currently a regulation or recognized industry standard that imposes upon brokers the obligation which the Estate herein urges this court to impose upon Cassiday. As the appellees point out in their appellate brief, the area of securities transactions is regulated by a significant body of state and federal regulatory guidelines. Those entities responsible for promulgating the aforementioned securities regulations have thus far refrained from enacting a requirement that brokers must perform a "time-to-recover-costs" analysis. In view of this, and absent compelling reasons for judicial incursion into this area, we are loathe to create by judicial fiat such a requirement.

The trial court did not err in determining that Cassiday did not violate IC § 23–2–1–12 in failing to undertake an analysis to determine the amount of time it would take Carroll to recover her transactional costs.

### 3.

■ The Estate contends that Cassiday violated 710 IAC § 1–17–1(x) by failing to discuss with Carroll the tax implications of the systematic withdrawal program, and that he violated IC § 23–2–1–12 by providing Carroll with allegedly inaccurate information.

710 IAC § 1–17–1(x) imposes a requirement upon brokers to conduct a reasonable inquiry into the customer's investment objectives, financial situation and needs, "and any other relevant information," before recommending the purchase, sale, or exchange of any security. The Estate offers as proof of its claim that Cassiday violated this provision the fact that he erroneously indicated to Carroll that her tax liability would be approximately $10,000, when in fact the tax liability was fifty percent higher than that amount. According to the Estate, a reasonable inquiry into the effects of the proposed program on Carroll's capital gains taxes would have produced a more accurate assessment of Carroll's liability.

The Estate's argument is flawed in that Cassiday did not take it upon himself to advise Carroll on the subject of taxes. Cassiday cautioned Carroll from the outset that he did not possess the requisite expertise on the subject to give tax advice, and he encouraged her to consult with her accountant about the tax implications of the proposed transactions. At Carroll's request, Cassiday agreed to call Carroll's accountant and advise him of the proposed investment program, and the evidence favorable to the judgment reveals that Cassiday did just that. Moreover, Winemiller testified that Carroll subsequently called him and discussed the investment program recommended by Cassiday. She did so after having already completed several transactions that triggered capital gains tax liability. It is significant that Carroll conducted several other transactions *after* her conversation with Winemiller. Therefore, the evidence favorable to the judgment would support a conclusion that Cassiday did not misstate a material fact or omit to state a material fact. To the contrary, he informed Carroll that there would be negative tax consequences and advised her to consult her accountant about the amount of that liability.

■ In summary, subsection (x) requires brokers to conduct a reasonable inquiry into a customer's individual circumstances. In this context, a reasonable inquiry is one that is sufficient to discover and consider all information relevant to the decision of which investment strategy to recommend. The evidence favorable to

the judgment reveals that Cassiday determined that Carroll would incur capital tax gains liability and informed her of that consideration. At the same time, however, Cassiday advised Carroll that he was not an accountant and that she should contact her own accountant for advice on that subject. She did so and continued to implement components of the program recommended by Cassiday after that discussion with CPA Winemiller.[2] The trial court did not err in concluding that, based upon these circumstances, Cassiday did not incur liability based upon a violation of 710 IAC § 1–17–1(x).

Finally, because we affirm the trial court's determination that the Appellees did not violate the Securities Act as set out in the three issues discussed above, we need not consider two additional issues presented by the Estate, i.e., (1) whether the Appellees were "purchasers" within the meaning of the Act and thereby subject to civil liability, and (2) whether, for purposes of the allegation of constructive fraud, the Appellees were in a fiduciary relationship with Carroll.

Judgment affirmed.

DARDEN, J., and VAIDIK, J., concur.

---

2. In fact, during the period of time that Cassiday provided services for Carroll, Carroll also engaged in securities transactions through another broker with whom she had a longstanding professional relationship. During the time that Cassiday provided investment services for Carroll, he proposed several courses of action. Carroll consistently made the ultimate decision whether to adopt Cassiday's recommendations, and did not always follow his advice.