STATE of Indiana, Indiana State Department of Natural Resources, Indiana State Personnel Department, Indiana State Budget Agency, Appellants–Defendants,

v.

Felix HENSLEY, Jeff Atwood, Anthony Wilson, and Max Jacobus, on behalf of themselves and all others similarly situated, Appellees–Plaintiffs.

No. 03A01–9811–CV–414.

Court of Appeals of Indiana.

Sept. 15, 1999.

---

Jeffrey A. Modisett, Attorney General of Indiana, James A. Garrard, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellants.

Gerald G. Angermeier, Jerry E. Prall, Jewell, Crump & Angermeier, Julia Ann Caudill, Virginia Boswell, Caudill & Fischer, Columbus, Indiana, Attorneys for Appellees.

## OPINION

BAILEY, Judge.

### Case Summary

Appellants–Defendants State of Indiana, Indiana State Department of Natural Resources, Indiana State Personnel Depart-

ment, and Indiana State Budget Agency (collectively, "State") appeal the judgment in the amount of $3,714,241.00 entered in favor of Appellees–Plaintiffs, a class of Indiana Conservation Officers represented by Felix Hensley ("ICOs"). We affirm in part and reverse in part.

## Issues

The State raises three issues which we restate as follows:

I. Whether the trial court erred by concluding that Public Law 180–1990 required that Indiana Conservation Officers receive equivalent salaries and overtime pay as Indiana State Police Officers of comparable rank, experience, and qualification.

II. Whether the trial court erred in determining that ICOs were entitled to the $840.00 annual "emergency service allowance" granted to certain State Police Officers by Public Law 357–1989.

III. Whether the trial court erred in awarding prejudgment interest against the State.

## Facts

The operative facts are not disputed. In the 1989 budget, the Indiana General Assembly appropriated money to provide certain members of the Indiana State Police with an "emergency service allowance" as follows:

The . . . appropriations designated "emergency service allowance" are for the express purpose of compensating state police officers for being on call twenty-four (24) hours per day, every day of the year. To qualify for the emergency service allowance, an employee must be a sworn state police officer with full arrest power and must meet all training requirements set forth by the superintendent of state police. Employees in the salary classification of communications officer, weighmaster and port security officer are not eligible for the emergency service allowance. This allowance will amount to eight hun-

dred forty dollars ($840.00) per year for each qualified officer, and is to be paid in twenty-six (26) equal installments.

The emergency service allowance shall not be included in the state police grade and salary classification code for any purpose and shall not be calculated for purposes of department or personal contributions or benefits.

Pub.L. No. 357–1989.

Then, as stated in an earlier, interlocutory appeal of this case:

During the 1990 legislative session, our General Assembly passed P.L. 180–1990, an Act concerning the compensation of Indiana State Law Enforcement Officers, which read, in pertinent part, as follows:

. . . .

(e) The personnel department shall establish the *same* position classification plans and salary wage schedules (including overtime policies) for law enforcement officers of the law enforcement division of the department of natural resources that are established for law enforcement officers of the state police department.

*State v. Hensley,* 661 N.E.2d 1246, 1248 (Ind.Ct.App.1996) (original had entire subsection (e) emphasized). The State failed to implement this statutory directive. *Id.* at 1249. The ICOs initiated the present litigation to compel the State to adopt procedures whereby ICOs would receive compensation equivalent to their ISP counterparts. *Id.* at 1247. We affirmed the trial court's denial of the State's motion to dismiss. *Id.* at 1250.

In its bid to comply with Pub.L. No. 180–1990, the State implemented changes affecting the compensation of ICOs which it summarized as follows:

Pay ranges were revised to *mirror* the State Police pay ranges. A Financial Management Circular was issued to alter overtime pay practices to *mirror* State Police practices.

(R. 513, State's Answers to Interrogatories) (emphasis added). Although the new pay schedules for ICOs mirrored those of the Indiana State Police ("ISP"), the salaries of ICOs were still lower than the salaries of ISPs of comparable rank, experience, and qualifications. (R. 619).

In the present lawsuit, the ICOs sought back pay from July 1, 1990, the effective date of Pub.L. No. 180–1990. As a component of this claim, the ICOs sought compensation equivalent to the $840 annual "emergency service allowance" received by ISPs under Pub.L. No. 357–1989. Additionally, the ICOs sought to recover prejudgment interest on the amounts allegedly underpaid.

■ Both parties moved for summary judgment. The trial court granted partial summary judgment in favor of the ICOs finding in pertinent part as follows:

5. Prior to the enactment of P.L. 180–1990, ICOs of comparable rank, experience, and qualifications to ISP officers had lower annual salaries than their ISP counterparts.

6. Prior to the enactment of P.L. 180–1990, ICOs of comparable rank, experience, and qualifications to ISP officers did not receive $840.00 in annual compensation received by ISP officers, designated as an 'emergency service allowance'. The emergency service allowance, created by P.L. 357–1989, was for the 'express purpose' of compensating ISP officers for being on call twenty four (24) hours per day, every day of the year. To be eligible, ISP officers had to be sworn officers with full arrest powers who met the training requirements established by the department.

7. ICOs have qualification and training requirements which are at least as extensive as those for ISP officers.

8. ICOs, like ISP officers, are sworn law enforcement officers with full arrest powers, and are on call twenty four (24) hours per day, three hundred sixty five (365) days per year.

9. The emergency service allowance was paid to eligible ISP officers in twenty-six (26) equal installments.

10. Although the emergency service allowance was expressly not designated 'salary', and was not calculated for purposes of department or personal contributions for benefits, it was compensation, and therefore, falls within the plain, ordinary, and usual meaning of the terms 'wage' and 'overtime'.

. . . .

The designated evidentiary matter shows that there is no genuine issue as to any material fact on the liability issue, and that [the ICOs] are entitled to judgment as a matter of law. The Court designates the issues or claims on which it finds no genuine issue as to any material facts as follows:

a. The clear intent of the legislature in enacting P.L. 180–1990, Section 1(e), as reflected by the plain, ordinary, and usual meaning of the words utilized, as well as the reasons for enactment of the statute, the existing state of affairs when the statute was enacted, the statutes' design, and the consequences that flow from the various interpretations given the statute by the parties, was to direct that ICOs and ISP officers of comparable rank, experience, and qualifications be treated the same with respect to position classifications, salaries, wages, and overtime; and

b. The [State has] not properly implemented P.L. 180–1990, Section 1(e) to effectuate the legislative intent that ICOs and ISP officers of comparable rank, experience, and qualifications receive equivalent compensation, in that the [State] failed to rectify the existing pay inequities and to pay an emergency service allowance, or its cash equivalent, to ICOs.

The Court enters partial summary judgment in [the ICOs'] favor, and against [the State], respecting the issue of liability. ICOs shall receive equivalent compensation to ISP officers of

comparable rank, experience, and qualifications, including provision of an emergency service allowance or its cash equivalent, effective July 1, 1990 through this date. The Court further finds that the total damages have not yet been ascertained.

(R. 585–86, 592–93) (citations to designated materials omitted).[1]

The trial court set the matter for a hearing on the issue of damages. As a component of damages, the ICOs asserted their entitlement to prejudgment interest, which the State disputed. The parties entered into a stipulation regarding the various elements of the ICOs' claimed damages which may be summarized as follows:

1. The amount of hourly and overtime underpayments from July 1, 1990 through December 31, 1997 was $1,883,194.

2. The amount of the total underpayment attributable to the $840 annual emergency service allowance from July 1, 1990 through December 31, 1997 exclusive of interest was $1,247,691.

3. The amount of prejudgment interest which would accrue on the hourly, overtime, and emergency service allowance underpayments from July 1, 1990, through December 31, 1997, was $1,329,447.[2]

The trial court entered findings in conjunction with its final judgment that the ICOs were entitled to the sum of hourly, overtime, and emergency service allowance underpayments for the period of July 1, 1990, through December 31, 1997, in the amount of $3,130,885. (R. 741). Additionally, the trial court found that the ICOs were entitled to prejudgment interest at the rate of 6% beginning June 8, 1995, through October 1, 1998 in the amount of $583,356. (R. 741).[3] Accordingly, the trial court entered judgment in favor of the ICOs for a total of $3,714,241. (R. 741). This appeal ensued.[4]

1. Although trial court findings entered in summary judgment proceedings aid appellate review, they are not binding upon this court. *Althaus v. Evansville Courier Co.*, 615 N.E.2d 441, 444 (Ind.Ct.App.1993). The State asserts that the trial court erred in considering the affidavits of state legislators which stated that Pub.L. No. 180–1990 had been intended to be a "pay parity" bill for ICOs and ISPs, citing *A Woman's Choice–East Side Women's Clinic v. Newman*, 671 N.E.2d 104, 110 (Ind.1996). However, as we have conducted a de novo review of the statutory interpretations involved in this case without considering the affidavits submitted by the legislators, any error in the trial court's consideration of these affidavits is harmless. *See Wade v. Norfolk and Western Ry. Co.*, 694 N.E.2d 298, 299 n. 1, 301 (Ind.Ct.App.1998) (noting that where a trial court's entry of summary judgment has been subjected to a de novo review, any error in the trial court's consideration of designated materials or in the entry of its advisory findings was harmless); *See also, O'Laughlin v. Barton*, 582 N.E.2d 817, 821 (Ind.1991) (holding that the trial court's consideration of the affidavits of individual legislators to discern legislative intent was harmless error).

2. These figures were computed from the stipulated amounts of (1) the sum of hourly underpayments including the emergency service allowance of $3,033,108; (2) the sum of overtime underpayments of $97,777; (3) the total underpayment attributable to the emergency service allowance from July 1, 1990 through June 30, 1995, in the amount of $823,239; (4) the total underpayment attributable to the emergency service allowance from July 1, 1995 through December 31, 1997, in the amount of $424,452; (5) the sum of the total award including prejudgment interest of $4,460,332; and (6) the sum of the total award without prejudgment interest of $3,130, 885. (R. 618–20).

3. It is not clear to us how the trial court arrived at this figure. However, as we have reversed the award of prejudgment interest, the matter is of no consequence.

4. During the 1999 legislative session, after the present appeal had been perfected, our General Assembly amended IND.CODE § 14–9–8–28 governing the compensation of ICOs to read in pertinent part as follows:

(d) The salaries for law enforcement officers of the law enforcement division of the department must be equal to the salaries of police employees of the state police department under IC 10–1–1–4.5, based upon years of service in the department and rank held.

. . . .

## Discussion and Decision

### A. Standards of Review

#### 1. Summary Judgment

As stated in *Barnes, as Mayor of the City of Gary v. Antich*, 700 N.E.2d 262, 264–65 (Ind.Ct.App.1998), *trans. denied:*

In reviewing a motion for summary judgment, this court applies the same standard as the trial court. We must determine whether there is a genuine issue of material fact and whether the law has been correctly applied by the trial court. Summary judgment is appropriate only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Neither the trial court, nor the reviewing court, may look beyond the evidence specifically designated to the trial court. Once the movant for summary judgment has established that no genuine issue of material fact exists by submission of materials contemplated by T.R. 56, the nonmovant may not rest on his pleadings but must set forth specific facts, using supporting materials contemplated under the rule, which show the existence of a genuine issue for trial.

#### 2. Statutory Interpretation

■ The interpretation of a statute is a legal question which is reviewed de novo. *Indiana Bell Telephone Co., Inc. v. Indiana Utility Regulatory Comm'n*, 715 N.E.2d 351, 354 (Ind. 1999). Statutory interpretation is the responsibility of the court and within the exclusive province of the judiciary. *Miller Brewing Co. v. Bartholemew County Beverage Co., Inc.*, 674 N.E.2d 193, 200 (Ind.Ct.App.1996). The first and often the last step in interpreting a statute is to examine the language of the statute. *Indiana Bell*, 715 N.E.2d at 354. As stated in *In re the Visitation of J.P.H.*, 709 N.E.2d 44, 46 (Ind.Ct.App.1999):

When interpreting a statute, the foremost objective is to determine and effect legislative intent. Statutes must be construed to give effect to legislative intent, and courts must give deference to such intent whenever possible. Thus, courts must consider the goals of the statute and the reasons and policy underlying the statute's enactment. Courts are to examine and interpret a statute as a whole, giving words their common and ordinary meaning, and not overemphasize a strict, literal, or selective reading of individual words. Words and phrases are taken in their plain, ordinary, and usual meaning unless a different purpose is manifested by the statute. Where possible, every word must be given effect and meaning, and no part is to be held meaningless if it can be reconciled with the rest of the statute. The meaning and intention of the legislature are to be ascertained not only from the phraseology of the statute but also by considering its nature, design, and the consequences which flow from the reasonable alternative interpretations of the statute. Statutes relating to the same general subject matter are in pari materia and should be construed together so as to produce a harmonious statutory scheme.

*Id.* (citations omitted); *see also Hensley*, 661 N.E.2d at 1248. We cannot presume that the legislature intended that a statute was to be applied in an illogical manner or to contain useless provisions, the effect of

---

(f) The requirement of subsection (d) does not affect:
    (1) any rights or liabilities accrued; or
    (2) any proceedings begun;
on or before June 30, 1999. Those rights, liabilities, and proceedings continue and shall be imposed and enforced under prior civil law and procedure as if the requirement of subsection (d) had not been enacted.

Pub.L. No. 206–1999. Ordinarily, we will look to the amendment of a statute as an indication of the legislature's intent at the initial enactment of the statute. *See Tedlock v. State*, 656 N.E.2d 273, 276 (Ind.Ct.App. 1995). However, we interpret subsection (d) above as an express directive that we are not to consider the 1999 amendment in our determination of legislative intent with respect to Pub.L. No. 180–1990.

which could have been easily avoided. *Board of Health v. The Journal–Gazette Co.,* 608 N.E.2d 989, 992–93 (Ind.Ct.App. 1993), *adopted,* 619 N.E.2d 273. For guidance in determining the intent of the legislature, it is appropriate for the court to examine the history surrounding the statute in question. *Sangralea Boys Fund v. Board of Tax Comm'rs,* 686 N.E.2d 954, 957 (Ind. Tax Ct.1997), *review denied.* The court may not construe a statute in a manner that would impair the function the legislature intended it to possess. *Id.* at 959. Although an agency's interpretation of a statute is entitled to great weight, courts rather than administrative agencies must resolve questions of statutory construction. *Indiana Civil Rights Comm'n v. Alder,* 714 N.E.2d 632, 635–636 (Ind. 1999). Where the facts are undisputed, the interpretation of a statute is a question of law and an agency's interpretation of the statute and disposition of the case are not entitled to deference from this court. *Twin States Publ'g Co., Inc. v. Indiana Unemployment Ins. Bd.,* 678 N.E.2d 110, 112 (Ind.Ct.App.1997), *trans. denied.*

I. *Whether Pub.L. No. 180–1990 Mandated that ICOs Receive the "Same" Salaries as ISPs or Salaries which "Mirror" those of the ISP*

### A. State's Contention

▇▇ The State contends that the trial court erroneously interpreted Pub.L. No. 180–1990 to require that ICOs receive equivalent compensation as ISPs of comparable rank and experience. (Appellant's brief at 16). Specifically, the State contends that Pub.L. No. 180–1990 required the State Personnel Department to establish the same position classification plans and salary wage schedules, including overtime policies, for ICOs as for ISPs, but did not require pay parity between ICOs and ISPs. (Appellant's brief at 16). Therefore, as the State's argument proceeds, the classification plan, salary range, and overtime policies implemented for the ICOs which "mirrored" the plan, salary ranges, and

policies of the ISP fulfilled its obligation to comply with Pub.L. No. 180–1990.

### B. Analysis

As noted above, the critical language of Pub.L. No. 180–1990 § 1(e) provides that ICOs are to have "the same position classification plans and salary wage schedules" as the ISP. "Class" or "class of position" is defined in the Indiana Administrative Code as follows:

a group of positions in the non-merit service sufficiently alike in duties, authority and responsibility that the same qualifications may reasonably be required for, and the same schedule of pay can be equitably applied to, all positions in the group.

31 IAC § 1–1–1. This regulation is in pari materia with Pub.L. No. 180–1990 and we should attempt to construe them together to produce a harmonious statutory scheme. Therefore, a construction of Pub.L. No. 180–1990 § 1(e) together with the definition of "class" or "class of position" provided by 31 IAC § 1–1–1, leads to the conclusion that Pub.L. No. 180–1990 § 1(e) was intended to be a pay parity bill because the ICOs and the ISPs are to have "the same position classification plans and salary wage schedules (including overtime polices)" such that the "same schedule of pay can be equitably applied to all positions" in the classification plans. In short, Pub.L. No. 180–1990 § 1(e) should be interpreted as requiring ICOs and ISPs to have "the same position classification plans" with the "same schedule of pay."

The State's proffered interpretation is unreasonable. As discussed above, the State construes Pub.L. No. 180–1990 § 1(e) as requiring ICOs to have the same position classification plans as the ISPs but with salary schedules which are lower, but mirror, their ISP counterparts. Salary schedules which mirror, but are lower, are not "same ... salary wage schedules" as provided for by Pub.L. No. 180–1990 § 1(e). Additionally, "a schedule of pay" which is lower cannot be said to "be equi-

tably applied to" the "same position classification plan." [5]

We hold that the trial court correctly concluded that our legislature, by enacting Pub.L. No. 180–1990 § 1(e), mandated that ICOs receive equivalent salaries and overtime pay as ISPs of comparable rank and experience. Accordingly, we affirm the portion of the judgment pertaining to the hourly and overtime underpayments from July 1, 1990 through December 21, 1997 in the amount of $1,883,194.

## II. Emergency Service Allowance

■ However, we cannot conclude that the General Assembly intended that Pub.L. No. 180–1990 § 1(e) would operate to provide that ICOs receive the annual $840.00 emergency service allowance that was appropriated for certain ISPs pursuant to Pub.L. No. 357–1989. First of all, the emergency service allowance as authorized by Pub.L. No. 357–1989 was not to "be included in the state police grade and salary classification code for any purpose." As discussed under Issue I above, Pub.L. No. 180–1990 provided that ICOs were to receive the same "salary wage schedules (including overtime policies)" as ISPs of comparable rank and experience. Thus, the General Assembly intended that the emergency service allowance not be considered a part of an ISP's salary, but something extra. See Jeurissen v. Amisub, Inc., 554 N.E.2d 12, 13 (Ind.Ct.App. 1990) (holding that employees' bonus which was not tied to regular work performed on a periodic basis was not a "wage" but was "something extra"). Moreover, the emergency service allowance was not provided to all ISPs, but excluded the classifications of "communications officer, weighmaster and port security officer." See Pub.L. No. 357–1989. We cannot conclude that the legislature could have intended that the emergency service allowance be paid to all ICOs, but only to certain ISPs.

We hold that the trial court erred in concluding that ICOs were entitled to receive an amount equal to the emergency service allowance. Therefore, we reverse the portion of the judgment pertaining to the underpayment attributable to the annual emergency service allowance and remand with instructions that judgment be entered for the State with respect to this part of the ICOs' claim.

## III. Prejudgment Interest

■ The State is correct that the trial court erred by awarding prejudgment interest against the State. See Indiana Dept. of Public Welfare v. Chair Lance Service, Inc., 523 N.E.2d 1373, 1379–80 (Ind.1988) (holding that the doctrine of sovereign immunity dictates that the State cannot be liable for prejudgment interest, even where it has wrongfully withheld or unreasonably delayed the payment of sums owed).[6] Therefore, we reverse the portion of the judgment which pertains to prejudgment interest and remand with instructions that judgment be entered in favor of the State on this part of the ICOs' claim.

## Conclusion

Based on the above, we affirm the portion of the judgment pertaining to the

---

5. For what it is worth, we held in the earlier, interlocutory appeal as follows:

   In the present case, the intent of P.L. 180–1990 is apparent on its face. Subsection (e) plainly directed [the] State Personnel Department to establish *equivalent* position classifications and salary wage schedules for Conservation Officers to those that were to be established for State Police Officers. *Hensley,* 661 N.E.2d at 1248 (emphasis added). In this earlier decision, it would appear that we equated the words "same" with "equivalent." Again, we note that the language "same" . . . "salary schedules" is more reasonably interpreted as providing for "equivalent" salaries than lower salaries.

6. The ICOs assert that the denial of prejudgment interest would violate certain constitutional rights. However, the ICOs need to address these claims to our supreme court as this court is bound by the *Chair Lance* decision. *See State v. Virtue,* 658 N.E.2d 605, 609 (Ind.Ct.App.1995) (holding that this court is required to follow the decisions of our supreme court).

hourly and overtime underpayments in the amount of $1,883,194. We reverse the portions of the judgment pertaining to the emergency service allowance and prejudgment interest and remand with instructions that judgment be entered for the State on these claims.

GARRARD, J., and HOFFMAN, Sr.J., concur.