Edward COHN, Commissioner of the Indiana Department of Correction, et al., Appellants–Defendants,

v.

Marcus STRAWHORN, et al., Appellees–Plaintiffs.

No. 49A02–9903–CV–183.

Court of Appeals of Indiana.

Dec. 29, 1999.

---

Jeffrey A. Modisett, Attorney General of Indiana, Jon Laramore, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellants.

Kenneth J. Falk, Indiana Civil Liberties Union, Indianapolis, Indiana, Attorney for Appellees.

## OPINION

BAILEY, Judge

### Case Summary

Appellants–Defendants Edward Cohn, in his official capacity as Superintendent of the Indiana Department of Correction, and the Indiana Department of Correction (collectively referred to as "DOC") appeal the summary judgment entered in favor of Appellees–Plaintiffs, a class of prisoners committed to the DOC but placed in county jails ("DOC Jail Prisoners"). We reverse and remand with instructions that summary judgment be entered in favor of the DOC.

### Issues

The DOC raises four issues which we consolidate and restate into two as follows:

I. Whether the DOC Jail Prisoners have a statutory entitlement to educational and/or substance abuse treatment programming.

II. Whether the Equal Protection Clause of the United States Constitution and/or the Privileges and Immunities Clause of the Indiana Constitution have been violated by the DOC's failure to provide educational and/or substance abuse treatment programming for the DOC Jail Prisoners.

### Facts/Procedural History

The designated evidence is undisputed. There are approximately 17,600 persons committed to the custody of the DOC. (R. 121). However, due to a shortage of bed space in DOC facilities, 1,334 persons (representing approximately 7.6% of all in-

mates) are confined in county jails awaiting the opening of a bed in a DOC facility. (R.120, 161–207). The DOC pays $35.00 per day for each DOC inmate housed in a county jail. (R. 330).

A DOC Jail Prisoner will, on average, spend six to eight months in a county jail. (R. 73). However, as of December 2, 1997, 231 DOC Jail Prisoners had been confined in county jails at least 11 months. (R. 161–207). These 231 prisoners represent approximately 1.3% of the total number of prisoners committed to the DOC.

Every adult DOC facility provides prisoners with educational programming and substance abuse treatment/programming. (R. 214). Prisoners confined to any adult DOC facility may obtain either a General Education Diploma ("GED") or a regular high school diploma (some only via correspondence). (R. 213). Most of the adult, non-minimum, security DOC institutions also provide the opportunity for prisoners to obtain a college level degree, either through in-person programming or via correspondence. (R. 213). Some of these programs have waiting lists. (R. 213). DOC inmates may reduce the executed portion of their sentences by completing educational or substance abuse programs. *See* IND.CODE § 35–50–6–3.3.[1]

Approximately one-half of the county jails offer GED programs to their inmates, including the DOC Jail Prisoners. (R. 80, 84, 140–41). Very few county jails offer college or high school diploma programs. (R. 141, 260–321). Similarly, very few county jails offer substance abuse treat-

ment programs. (R. 260–321). The DOC does not require county jails to provide educational or substance abuse treatment programming, nor does the DOC provide funding to the county jails to implement these programs. (R. 330).

■■■ The DOC Jail Prisoners initiated the present lawsuit alleging that the DOC had violated their statutory and constitutional rights by failing to provide them with educational and/or substance abuse treatment programs which would have enabled them to reduce their sentences under IND.CODE § 35–50–6–3.3. (R. 10). The trial court granted the DOC Jail Prisoners' motion for summary judgment ruling that the DOC Jail Prisoners had a statutory entitlement to educational and substance abuse treatment programming.[2] To implement its ruling, the trial court entered the following order:

> The DOC is ordered and enjoined to make such programming available to its prisoners which it confines to county jails and in order to accomplish this the DOC shall, within 75 days of this order, submit to this Court for its approval, a plan specifying with precise dates of initiation, how it will provide such programming at the earliest times possible.

(R. 411). The trial court also found that the DOC Jail Prisoners were entitled to an award of reasonable attorney's fees as the prevailing party.[3] (R. 410–11). This appeal followed.

---

1. The provision related to sentence reduction for the successful completion of a substance abuse program was formerly codified at IND. CODE § 35–38–1–23 (repealed by P.L. 183–1999 § 4).

2. Although trial court findings entered in summary judgment proceedings aid appellate review, they are not binding upon this court. *Althaus v. Evansville Courier Co.*, 615 N.E.2d 441, 444 (Ind.Ct.App.1993). We may affirm summary judgment on any legal theory supported by the designated materials. *See Wolfe v. Stork RMS–Protecon, Inc.*, 683 N.E.2d 264, 267 (Ind.Ct.App.1997). Thus, as set out un-

der Issue II, we will address the alternate, constitutional arguments properly advanced by the DOC Jail Prisoners in support of their motion for summary judgment. *See Nelson v. Jimison*, 634 N.E.2d 509, 511 (Ind.Ct.App. 1994).

3. Because we reverse and remand with instructions that judgment be entered in favor of the DOC, it is axiomatic that the trial court's award of attorneys' fees to the DOC Jail Prisoners as the prevailing party must also be reversed.

## Discussion and Decision

### Judicial Intervention in Prison Administration—Generally

■ Courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. *Turner v. Safley,* 482 U.S. 78, 85–86, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The operation of a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. *Id.* The complex and intractable problems in prisons are not readily susceptible of resolution by judicial decree. *Id.* Thus, courts will afford substantial deference to the professional expertise of correction officials with respect to the day-to-day operation of prisons and the adoption and execution of prison policies. *Id.; Bell v. Wolfish,* 441 U.S. 520, 548–49, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

### Standard of Review—Summary Judgment

■ As stated in *Barnes, as Mayor of the City of Gary v. Antich,* 700 N.E.2d 262, 264–65 (Ind.Ct.App.1998), *trans. denied:*

> In reviewing a motion for summary judgment, this court applies the same standard as the trial court. We must determine whether there is a genuine issue of material fact and whether the law has been correctly applied by the trial court. Summary judgment is appropriate only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Neither the trial court, nor the reviewing court, may look beyond the evidence specifically designated to the trial court. Once the movant for summary judgment has established that no genuine issue of material fact exists by submission of materials contemplated by T.R. 56, the nonmovant may not rest on his pleadings but must set forth specific facts, using supporting materials contemplated under the rule, which show the existence of a genuine issue for trial. A trial court's grant of summary judgment is 'clothed with a presumption of validity,' and the appellant bears the burden of demonstrating that the trial court erred.

(citation omitted). Summary judgment is appropriate when there is no dispute or conflict regarding facts which are dispositive of the litigation. *Federal Kemper Ins. Co. v. Brown,* 674 N.E.2d 1030, 1033 (Ind. Ct.App.1997), *trans. denied.* This court, on appeal, may appropriately determine that summary judgment was entered for the wrong party and direct that judgment be entered for the party entitled to summary judgment. *Id.*

### I. Statutory Entitlement to Educational and/or Substance Abuse Treatment Programming

#### A. Prisoner's Contentions— The Faver Decision

The DOC Jail Prisoners contended, and the trial court agreed, that all prisoners have a statutory entitlement to educational programming under IND.CODE § 11–10–5–1 which reads, in pertinent part, as follows:

> The department shall ... implement academic and vocational education curricula and programs for committed offenders....

Similarly, the DOC Jail Prisoners contended, and the trial court agreed, that all prisoners have a statutory entitlement to substance abuse treatment under IND.CODE § 11–10–3–2(c) which provides that a person committed to the DOC is entitled to medical care and mental health care.

The trial court in the present case found that the DOC Jail Prisoners had a statutory entitlement to educational and substance abuse treatment programming based in large part upon our decision in *Faver v. Bayh,* 689 N.E.2d 727, 733 (Ind. Ct.App.1997). In *Faver,* a class of prisoners confined to the Protective Custody Unit of the Indiana State Farm alleged that the DOC had violated their statutory

and constitutional rights because they had not been allowed to participate in the educational programs that were offered to the general population of the prison. *See id.* at 728–29. In ruling in favor of the prisoners, we held:

> While we agree with the trial court's determination that Indiana Code § 11–10–5–1 does not impose an obligation on the [DOC] to provide each [educational] program to each offender, or a right on the part of an offender to gain access to each program, we hold that the statute mandates that the [DOC] provide access *to some form of education program* to all 'confined offenders.'

*Id.* at 733 (emphasis added).

### B. Precedential Value of the Faver Decision

The language of an appellate opinion must be restricted to the facts of the case then before the court, and a decision is authority only to that extent. *Pierce v. Blair*, 196 Ind. 710, 149 N.E. 560, 564 (1925); *see also In re Marriage of Dall*, 681 N.E.2d 718, 721 (Ind.Ct.App.1997) (noting that an earlier decision of our court should be confined to its unique and narrow facts). As will be discussed below, we hold that *Faver*, which compared the disparate treatment of prisoners confined in different parts of the same institution, constitutes little, if any, precedential authority for the present comparison of prisoners confined to DOC institutions and the DOC Jail Prisoners.

### C. Statutory Interpretation

As stated in *State v. Hensley*, 716 N.E.2d 71, 76 (Ind.Ct.App.1999), *trans. pending*:

> The interpretation of a statute is a legal question which is reviewed de novo. Statutory interpretation is the responsibility of the court and within the exclusive province of the judiciary. The first and often the last step in interpreting a statute is to examine the language of the statute.... 'When interpreting a statute, the foremost objective is to determine and effect legislative intent. Statutes must be construed to give effect to legislative intent, and courts must give deference to such intent whenever possible. Thus, courts must consider the goals of the statute and the reasons and policy underlying the statute's enactment. Courts are to examine and interpret a statute as a whole, giving words their common and ordinary meaning, and not overemphasize a strict, literal, or selective reading of individual words. Words and phrases are taken in their plain, ordinary, and usual meaning unless a different purpose is manifested by the statute. Where possible, every word must be given effect and meaning, and no part is to be held meaningless if it can be reconciled with the rest of the statute. The meaning and intention of the legislature are to be ascertained not only from the phraseology of the statute but also by considering its nature, design, and the consequences which flow from the reasonable alternative interpretations of the statute. Statutes relating to the same general subject matter are in pari materia and should be construed together so as to produce a harmonious statutory scheme.'

(citations omitted).

### D. Analysis—Statutory Entitlement to Educational Programming

In *Ratliff v. Cohn*, 693 N.E.2d 530 (Ind. 1998), decided more recently than *Faver*, 689 N.E.2d 727, our supreme court analyzed the following language of Art. 9, § 2 of the Indiana Constitution:

> The General Assembly shall provide institutions for the correction and reformation of juvenile offenders.

The *Ratliff* court held that this provision, which required the State to provide juvenile institutions, did not create an entitlement for *all* juvenile offenders to be committed to a juvenile facility. 693 N.E.2d at 540. In so holding, the supreme court noted that the provision did not include

language making the requirement applicable for *'all,'* *'every,'* *'any,'* or *'each'* juvenile offender. *Id.* at 536 (emphasis in original).

 Indiana's General Assembly knows how to provide an entitlement to DOC prisoners. For example, as will be discussed in greater detail below, IND.CODE § 11–10–3–2 provides that a "committed person is *entitled* to" medical care, first aid, and mental health care. (emphasis added). Thus, we believe that, had the General Assembly intended that IND.CODE § 11–10–5–1 provide a statutory entitlement for all prisoners, the statute would have provided so explicitly. Accordingly, based on *Ratliff,* 693 N.E.2d 530, we hold that the requirement that the DOC "shall ... implement academic and vocational education curricula and programs for committed offenders" does not create a statutory entitlement to educational programming for all, every, any, or each person committed to the DOC. Therefore, we reverse and remand with instructions that summary judgment be entered in favor of the DOC on this portion of the DOC Jail Prisoner's claim.

### E. Analysis—Statutory Entitlement to Substance Abuse Treatment Programming

Similarly, the DOC Jail Prisoners contended, and the trial court agreed, that all prisoners have a statutory entitlement to substance abuse treatment under IND.CODE § 11–10–3–2(c) which provides that a person committed to the DOC is entitled to:

(1) Medical care, medical personnel, and medical facilities of a quality complying with applicable state licensing requirements;

(2) First aid or emergency medical treatment on a twenty-four-hour basis; and

(3) Mental health care by a psychiatrist or psychologist.

Thus, the DOC Jail Prisoners' argument is necessarily dependent upon a determination that substance abuse treatment or programming is subsumed within the definition of "medical care" or "mental health care" as those terms are used in the statute.

However, the General Assembly knows how to refer specifically to substance abuse treatment as it pertains to the inmates of the DOC. Indiana Code § 11–10–8–2 reads in pertinent part as follows:

[T]he department shall establish a minimum security release program in which eligible committed offenders may be temporarily released from custody to:

(1) Work;

(2) Conduct a business or other self-employed occupation including housekeeping or attending to family needs;

(3) Attend an academic or vocational training institution or program;

(4) *Obtain medical, psychiatric, or psychological treatment, including treatment for drug addiction or alcoholism;* or

(5) Accomplish other purposes consistent with programs of the department.

(emphasis added). Additionally, Indiana Code §§ 11–13–8–1 & 3 provide that the DOC shall provide transitional programs for felons who are to be released on parole, discharged, or placed on probation which may include "substance abuse treatment and education."

 The exclusion of precise terminology specifying substance abuse treatment leads us to the conclusion that the general assembly did not intend that substance abuse treatment be necessarily subsumed within the definition of "medical care" or "mental health care" so as to create a statutory entitlement to such treatment in favor of all DOC inmates. *See JKB, Sr. v. Armour Pharmaceutical Co.,* 660 N.E.2d 602, 605 (Ind.Ct.App.1996) (noting that the specific inclusion of a reference in one part of a statutory scheme implies that its omission elsewhere was intentional). Moreover, it is absurd to conclude that the General Assembly could have intended that *all* DOC inmates be entitled to sub-

stance abuse treatment regardless of whether they in fact suffer from substance abuse. *See Barger v. State*, 587 N.E.2d 1304, 1306 (Ind.1992) (holding that courts will reject an interpretation of a statute which produces an absurd result).

Based on the above, we hold that the statutory entitlement of DOC inmates to medical care and mental health treatment under IND.CODE § 11–10–3–2 does not require the DOC to provide substance abuse treatment or programming to the DOC jail prisoners. Therefore, we reverse and remand with instructions that summary judgment be entered in favor of the DOC on this portion of the DOC Jail Prisoner's claim.

## II. Deprivation of DOC Jail Prisoner's Constitutional Rights

### A. Prisoner's Contentions

■■■■ As noted above, the DOC Jail Prisoners complain that the inmates of DOC prisons have the ability to access educational and substance abuse programs in order to obtain reductions in their sentences under IND.CODE § 35–50–6–3.3; while, at the same time, many DOC Jail Prisoners do not have access to educational and/or substance abuse treatment programming and cannot take advantage of these sentence reduction statutes.[4] Thus, the DOC Jail Prisoners reason that the disparate treatment afforded to these different classes of DOC prisoners is violative of the Equal Protection Clause of the United States Constitution and/or the Privileges and Immunities Clause of the Indiana Constitution.

The DOC Jail Prisoners rely on *Walker v. Luther*, 644 F.Supp. 76, 77 (D.Conn. 1986), which addressed a situation where prisoners convicted of crimes under the laws of the District of Columbia could be incarcerated in either a federal prison or in a local prison maintained by the District of Columbia. Prisoners who were incarcerated in the federal prisons initiated litigation arguing that their statutory rights and their constitutional right to equal protection were violated because the federal regulations imposed more severe standards for obtaining parole than did the regulations governing the prisoners incarcerated in the local District of Columbia prisons. *Id.* Ruling in favor of the prisoners, the court held:

> [T]he application of more burdensome procedures for parole upon male D.C. offenders in federal prison than upon male D.C. offenders in District of Columbia facilities violates equal protection, unless there is some rational basis for the disparate treatment. Mere geographic location of the prisoner is not a rational ground for the dramatic increased effect the federal scheme has upon the parole release of the prisoner.

*Id.* at 81. Accordingly, the court ruled that the District of Columbia standards for parole would govern the time and criteria

---

4. It is important to note that there is no constitutional right to be educated in prison. *See Higgason v. Farley*, 83 F.3d 807, 809–10 (7th Cir.1996) (holding that Indiana prisoners confined to a particular cellhouse outside the general population of the Indiana State Prison were not denied due process as the result of being denied access to educational programs which would have enabled then to earn sentence reductions under IND.CODE § 35–50–6–3.3).

Additionally, the DOC Jail Prisoners do not claim, nor could they reasonably claim, that the denial of access to substance abuse treatment to every DOC inmate, in and of itself, constitutes a violation of constitutional rights. Certainly, the government is obliged to provide medical care for those whom it is punishing by incarceration. *W.J. Estelle v. Gamble*, 429 U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (noting that the public must be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself). The rationale behind this holding is that the failure to provide medical care can produce physical 'torture or a lingering death' violative of the Eighth Amendment prohibition against cruel and unusual punishment. *Id.* at 102, 97 S.Ct. 285. There has been no contention that the denial of access to substance abuse treatment programming in prison constitutes cruel and unusual punishment.

for the release of the D.C. offenders committed to the federal prisons. *Id.*

### B. Prisoners' Rights—Standard of Review

 As stated in *Boehm v. Town of St. John*, 675 N.E.2d 318, 321 (Ind.1996): Every statute stands before us clothed with the presumption of constitutionality until clearly overcome by a contrary showing. The party challenging the constitutionality of the statute bears the burden of proof, and all doubts are resolved against that party. If there are two reasonable interpretations of a statute, one of which is constitutional and the other is not, we will choose that path which permits upholding the statute because we will not presume that the legislature violated the constitution unless such is required by the unambiguous language of the statute.

Convicted prisoners do not forfeit all constitutional protections by reason of their conviction. *Faver*, 689 N.E.2d at 730. However, lawful incarceration necessarily brings about the withdrawal or limitation of many privileges and rights which is justified by the considerations underlying our penal system. *Id.* The constitutional rights of prisoners are limited by the fact of incarceration and valid penological objectives, including deterrence of crime, rehabilitation of prisoners, and institutional security. *Id.*

 When a prison regulation impinges on an inmate's constitutional rights, the regulation is nevertheless valid if it is reasonably related to legitimate penological interests and does not represent an exaggerated response to those concerns. *Id.* In evaluating a particular regulation, the following factors should be considered: (1) whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule; (2) whether there are alternative means of exercising the right in question that remain available to prisoners; (3) the impact accommodation of the assert-

ed constitutional right would have on guards and other inmates and the allocation of prison resources; and (4) although the regulation need not satisfy the least restrictive alternative test, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable.

*Id.* at 730–31.

### C. Equal Protection under United States Constitution

 The guarantee of equal protection prohibits states from denying "to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1; *Hoovler v. State*, 689 N.E.2d 738, 742 (Ind.Ct.App.1997), *trans. denied.* The level of scrutiny to be applied depends upon whether the classification involves either a suspect class or a fundamental right. *Id.* Where neither a fundamental right or a suspect class is involved, the level of scrutiny used is the rational basis test, that is, the practice must be "rationally related to a legitimate government purpose." *Id.* However, with respect to prisoners' rights, in order to show a violation of the guarantee of equal protection, the inmate must show that the discrimination was intentional or deliberate. *Faver*, 689 N.E.2d at 731.

### D. Privileges and Immunities Clause of Indiana Constitution

 Article I, § 23 of the Indiana Constitution provides:

The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens.

Where unequal privileges or immunities are provided to different classes of persons, the proper constitutional inquiry under Section 23 consists of two requirements:

First, the disparate treatment accorded by the legislation must be reasonably

related to inherent characteristics which distinguish the unequally treated classes. Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated.

*Collins v. Day,* 644 N.E.2d 72, 80 (Ind. 1994). Legislative classification becomes a judicial question only where the lines drawn appear arbitrary or manifestly unreasonable. *Indiana High School Athletic Ass'n v. Carlberg,* 694 N.E.2d 222, 240 (Ind.1997). As long as the classification is based on substantial distinctions with reference to the subject matter, the courts are not to substitute their judgment for that of the legislature. *Id.* Courts owe deference to legislative line-drawing that has fiscal implications. *Id.*

### E. Analysis

■ Initially, it must be noted that the DOC Jail Prisoners do not necessarily receive disparate treatment from their counterparts confined in DOC institutions. Depending upon the county jail in which they are placed, some DOC Jail Prisoners do have access to educational and substance abuse treatment programming. *See Johnson v. Bender,* 174 Ind.App. 638, 369 N.E.2d 936, 939 (1977) (noting that the county sheriff is required to keep the jail and is responsible for the life, health, and safety of the prisoners).

Moreover, contrary to the assertion of the DOC Jail Prisoners, there are important characteristics which distinguish the class of DOC Jail Prisoners from their counterparts held in the DOC institutions beyond their simple geographic location as condemned in *Walker,* 644 F.Supp. at 77. First, the DOC Jail Prisoners, on average, have substantially shorter sentences to serve than the inmates confined to DOC prisons. Further, because the DOC Jail Prisoners' sentences are substantially shorter, fewer of these prisoners would have sufficient time to engage in meaningful course work or complete educational or substance abuse treatment programming

even if it were provided. Additionally, the DOC Jail Prisoners constitute a small percentage of the total number of persons committed to the DOC and are spread out in county jails all over the state. Thus, the negative fiscal ramifications of providing programming to all DOC Jail Prisoners is obvious. *See Carlberg,* 694 N.E.2d at 240 (noting that courts owe deference to the fiscal implications inherent in line-drawing). *Id.* Finally, the DOC does not deliberately or arbitrarily deny DOC Jail Prisoners access to programming. The DOC places prisoners in county jails because there is insufficient space in the prisons to accommodate all prisoners.

Based on the above, we must conclude as a matter of law that the DOC Jail Prisoners have not shown that the disparate treatment caused by their classification was intentional, deliberate, arbitrary, or manifestly unreasonable so as to sustain their claims of a violation of their rights under either the United States or Indiana Constitutions. Therefore, we reverse and remand with instructions that summary judgment be entered in favor of the DOC on this portion of the DOC Jail Prisoner's claim as well.

Reversed.

GARRARD, J., concurs.

SULLIVAN, J., dissents with separate opinion.

### SULLIVAN, Judge, dissenting

I do not disagree with the majority's reading of *Faver v. Bayh* (1997) Ind.App., 689 N.E.2d 727, and in the distinction drawn between disparate treatment between prisoners confined in different parts of the same penal facility, as in *Faver,* and treatment or programs which are available to prisoners in one facility but not to those confined in another, as in the case before us. Nevertheless, I believe that the underlying thrust of *Faver* with regard to provision of educational programs to DOC inmates remains undiluted. In this regard, the majority's conclusion renders

meaningless the clear and unmistakable import of I.C. 11–10–5–1.

That provision requires DOC to "implement [educational programs] for committed offenders." There can be no doubt that DOC Jail Prisoners are "committed offenders." If DOC utilizes a facility which has not implemented such a program or programs or if DOC fails to do so itself with regard to that detention facility, the Department has violated the clear provisions of the Act. There must be at least some minimal educational program or programs implemented in every facility to which an offender has been committed, whether temporarily or for the term of one's sentence.

It is possible, if not probable, that the General Assembly, in mandating educational programs for DOC offenders, did not contemplate placement in alternative custodial jail facilities. These placements have taken place of necessity. The administrative realities of making space available for offenders, however, does not abrogate DOC's duty o provide educational programs. DOC Jail Prisoners are DOC "committed offenders". They are, therefore, entitled to access to education programs under the auspices of the DOC as are other DOC prisoners.

This is not to say that every possible educational program must be provided at each and every penal facility; nor do I conclude that every committed offender in a particular facility be afforded the opportunity to participate in every program offered nor even to participate in a particular program of the inmate's choosing. I do conclude, however, that the DOC may not escape the dictates of the statute by putting in place an educational program in one institution and ignoring all others; nor may it avoid the clearly stated legislative intent by housing its committed offenders in facilities which do not offer such programs, unless the DOC takes measures to "implement" such a program or programs in the particular facility.

My analysis is not altered by *Ratliff v. Cohn* (1998) Ind., 693 N.E.2d 530, which according to the majority here, dilutes the implication, if not the precise holding of *Faver.* In *Ratliff* our Supreme Court made much of the fact that in requiring that "institutions for the correction and reformation of juvenile offenders" be provided, the drafters of our Constitution did not use an inclusive adjective such as "all" or "every" or "each" to describe the juvenile offenders to be covered. More importantly, however, the Court noted that at the time in question, the resulting statutes made it discretionary with the court to commit a juvenile, otherwise subject to confinement in a "jail [or] penitentiary," to the legislatively created Juvenile "House of Refuge." Thus, it does indeed appear, as held by our Supreme Court, that neither the specific language of the Constitutional provision nor the enabling legislation adopted by the General Assembly, contemplated that each and every juvenile subject to confinement would necessarily be housed in a facility separate and apart from facilities in which adults are held.

The same construction, however, is not applicable to I.C. 11–10–5–1. Although the General Assembly could have been more explicit with regard to providing educational advantages to inmates, the import of the provision is clear. The DOC is required to make such programs available for committed offenders. The members of the Class in this litigation are committed offenders. Therefore, no matter to what facility an offender is committed, there must be some form of educational programming provided.

DOC argues that plaintiffs seek unlimited and immediate educational program participation. Clearly such is not the case. The members of the class do not contend that inmates in transition or being temporarily confined for a brief period in a particular facility must be enrolled in an educational program which may be satisfactorily completed only by a longer period of time. Nor do they contend, for

example, that a master's degree program must be afforded to an inmate who has not even achieved a GED. They do contend, and correctly so, that they are entitled to reasonable access to educational programs which the statute requires the DOC to provide.[5]

Similarly, I would hold that members of the class must be afforded opportunity to participate in substance abuse treatment programs and counseling, where indicated by the particular inmate's history. In this regard it appears that the rationale used by the majority to hold otherwise is self defeating. The majority holds that because the legislature used phrasing in other provisions which reflects an intention to include treatment for substance abuse as "medical, psychiatric, or psychological treatment" as in I.C. 11–10–8–2(a)(4), the failure to use such inclusive language in I.C. 11–10–3–2(c) demonstrates a legislative intention to exclude such substance abuse treatment from the required "medical care and mental health care." To the contrary, it is my interpretation that the phrasing by the legislature in I.C. 11–10–8–2(a)(4) constitutes recognition that substance abuse treatment is medical and mental health treatment so that it is unnecessary to state the obvious in every statutory provision dealing with medical or mental health care.

The majority implies that to adopt the reasoning of the trial court would be to require substance abuse treatment and counseling to *all* inmates whether or not they have a substance abuse problem. Clearly, as noted by the majority, such would be an absurd construction of the statute. Clearly, also however, that is not the dictate of the trial court's judgment nor is it the position of the plaintiffs. Once again, however, as with the matter of

educational programs, my position is not reached through application of constitutional principles but rather solely as a matter of statutory interpretation.

For the reasons stated, I would affirm the judgment of the trial court granting summary judgment to plaintiffs.

---

5. The "reasonableness" caveat with regard to availability and access to educational opportunities while incarcerated is part and parcel of the constitutional discussion by the majority in Part II. While I do not agree with all of the factors which the majority utilizes to justify somewhat disparate treatment between

DOC prisoners and DOC Jail Prisoners, in essence, I agree that the plaintiffs have not demonstrated a violation of the U.S. or Indiana Constitution. Such conclusion, however, does not detract from my opinion that the result is statutorily mandated.