Jane DOE et al., Appellants–Plaintiffs,

v.

J. David DONAHUE, in his official capacity as Commissioner of the Indiana Department of Correction, Appellee–Defendant.

No. 49A02–0408–CV–674.

Court of Appeals of Indiana.

June 10, 2005.

Kenneth J. Falk, Indiana Civil Liberties Union, Indianapolis, for Appellants.

Steve Carter, Attorney General of Indiana, Frances H. Barrow, Indianapolis, for Appellee.

**OPINION**

BAILEY, J.

### Case Summary

Appellants–Plaintiffs Jane Doe and the class comprising all persons confined in institutions maintained by the Indiana Department of Correction, or who will be so confined in the future (collectively, the "Prisoners"), appeal the trial court's grant of summary judgment in favor of Appellee–Defendant J. David Donahue, in his official capacity as the Commissioner of the Indiana Department of Correction (the "Department"). We affirm.[1]

### Issues

The Prisoners raise four issues on appeal, which we consolidate and restate as:

I. Whether the trial court erroneously granted summary judgment to the Department because Executive Directive 02–01 ("ED 02–01") violates Indiana Code Section 11–11–3–9; and

II. Whether the trial court erroneously granted summary judgment to the Department because ED 02–01 violates the First, Eighth, and Fourteenth Amendments to the United States Constitution.

### Facts and Procedural History

*I. Background: Visitation at the Department's Prison Facilities*

The present controversy concerns the legality of ED 02–01, a directive enacted

1. We heard oral argument in this case on April 29, 2005, at the Crawford County Circuit Court with students from Crawford County High School in attendance. We thank the local Bar and the people of English for their hospitality, and we commend counsel for their able presentations. We also note the confusion that filled our morning regarding time. The courts in Crawford County operate on "fast time," but the schools operate on "slow time." Thus, we arrived for the argument an hour earlier than the high school students did. We find it ironic that this all took place the morning after our General Assembly passed the Daylight Savings Time bill. And we thank our legislature for hopefully alleviating future · confusion when we travel to the southern regions of Indiana.

by the Department that restricts offenders who have been convicted or adjudicated of certain sexual offenses from receiving visitors under the age of eighteen. The directive and its predecessor, Executive Directive 01–06, were implemented to protect children from abuse or misconduct during visitation sessions at the Department's prison facilities. To better understand the policy behind ED 02–01, we examine the reality of visitations at the facilities.

There are twenty-five adult facilities in Indiana ranging in security levels from one to four, with the highest level being four. All facilities have visitation areas. Level two through four facilities, which are the only facilities that house sexual offenders, have "semi-similar" visitation areas. Appellants' App. at 86. In particular, the visitation areas are open areas with twenty-five to thirty tables that can accommodate approximately one hundred people. At the beginning and end of a visit, a prisoner may embrace his or her visitor. However, when the prisoners and visitors are seated, everyone's hands must be on top of the table. There is typically one correctional officer to supervise the visitation room, but more may be added on weekends when visitation volume increases. Thus, according to Stephan McCauley, operational director for the Department's southern region, the visitation room is a "wild and crazy place." *Id.* at 88. In recounting his experience as a supervisor of a visitation room, he explained:

> There's a lot of activity. Obviously, a lot of our offenders are in their early 20s, and they have young kids, and they come to visit. So you have a lot of kids in the room, and they're running around. I mean, you know, it's hard to keep children down. So it's just noisy, hectic, a lot of movement.
>
> The vending machines are very popular because families take money into the visiting room. So I mean everyone's always moving through the visiting room, et cetera. I mean you're trying to keep your eye, especially on the weekend, on a hundred people, and you're constantly being distracted. It's easy to miss things. There's no doubt about it. One person has a very difficult time doing that.

*Id.*

Unlike the general population, prisoners who are on disciplinary or administrative segregation may only have non-contact visitation, either through closed-circuit television, a physical partition, or separation from the general visiting area. Such non-contact visitation is currently available at all level two through four facilities.

## II. Implementation of Executive Directives 01–06 and 02–01

On March 8, 2001, the former Commissioner of the Department issued Executive Directive 01–06 ("ED 01–06"), which provided that "[o]ffenders who have a current or past adjudication/conviction of a sex offense involving a minor[2] **SHALL NOT** be permitted to receive visits from minors." Appellants' App. at 56 (emphasis in original). As previously mentioned, ED 01–06 was enacted to protect "children from the possibility of being victimized while visiting offenders." *Id.* Indeed, ED 01–06 was the Department's acknowledgement of research, which showed that "victims of sex offenses know the perpetrators

---

2. These offenses include, but are not limited to, the following: "sexual assault on a child; incest; child molestation; child exploitation; child solicitation; child seduction; sexual misconduct with a minor; attempting to commit any of these offenses; promoting prostitution with a minor; and aiding, inducing or causing any of these offenses." Appellants' App. at 56.

between 80% and 90% of the time ... [and] that persons who prey on children often psychologically prepare the children for some time prior to engaging in any sexual activity." *Id.* In enacting ED 01–06, the Department recognized that sexual offenders have a high risk of reoffending, that their outward behaviors demonstrate responsible and trustworthy actions to others, that they use deception to gain trust, and that they maintain secrecy by psychologically grooming[3] the victim. In addition, the Department was cognizant of the problems that confront a prison facility's visiting room supervision staff, namely, that the supervisory staff: (1) may not recognize the psychological manipulation employed by sexual offenders; (2) are outnumbered and cannot not be everywhere at all times; and (3) may be psychologically prepared by the offender to view the offender as trustworthy, responsible, and unthreatening. Further, and perhaps most importantly, the Department was aware of incidents where children had been sexually molested in visiting rooms that were being supervised by prison staff. *Id.* at 62.

On February 11, 2002, the Department implemented a revised policy, ED 02–01, i.e., the policy at issue here, which outlines the procedures to be followed when offenders, who have been convicted or adjudicated of a sexual offense involving a minor, request to have a particular minor visit them. Pursuant to ED 02–01, when an offender is received at a departmental intake unit, his or her records will be reviewed to determine whether there has been either a conviction as an adult or an adjudication as a juvenile for a sexual offense involving a minor. "If there is such a conviction/adjudication, the offender's records [will] be marked with a 'Y' (for Yes) in the 'VMR' (Visitor–Minor Restriction) field in the Offender Information System (OIS)." *Id.* at 58. Subsequently, upon receipt of the offender at the appropriate housing facility, the Department's staff will determine whether the offender is a VMR Offender. If so, and if the offender has requested that minors be allowed to visit him or her, the staff will review the offender's records and decide whether he or she may be eligible for visitation with minors. Specifically, to be eligible for such visitation, the offender must meet the following criteria:

A) The offender has not had any designated disciplinary code violations for 12 months.

B) The intended visitor is an immediate family member—i.e., the offender's child, including adopted or stepchild, sibling, or grandchild—who was not the victim of the offense.

C) The offender has not been adjudicated/convicted of any other sexual offense and there is no documentation that the prisoner has had multiple victims.

D) The offender has not had any other visitation restrictions for sexually-related activities within the past twelve months.

E) There are no known court orders restricting or prohibiting the offender from visiting with the intended visitor.

F) The circumstances surrounding the adjudication/conviction indicate that the minor, though legally incapable of consenting, was not compelled by force or threat.[4]

---

3. "Grooming" is a very gradual process that child abusers use to "break down the intended victim's personal boundaries and allow the offender to offend." Appellants' App. at 62.

4. Evidence that the victim was compelled by force or imminent threat of force exists when: (1) the victim was under fourteen and the offender was eighteen or older; (2) regardless

If an offender meets the above criteria,[5] the Department's staff will request that a case management review be completed, assuming that one has not previously been prepared, by a private contractor who manages the Department's sex offender management and monitoring ("SOMM") program. The offender may appeal from an adverse determination by the SOMM staff or from the facility's decision to deny his or her request for visitation with minors.

Presently, there are approximately 20,000 adults confined within the Department's facilities. As of June 17, 2003, there were 2,795 prisoners with VMR restrictions. Of those 2,795 prisoners, 138 had applied for visitation and nine had been allowed visitation with minors as of June 5, 2003.[6]

### III. Commencement of the Present Litigation

On September 14, 2001, the original plaintiff, prisoner Jane Doe, filed her class action complaint.[7] On November 26, 2001, and by stipulation of the parties, the trial court certified the case as a class action pursuant to Indiana Trial Rule 23(B)(2). The class is defined as:

> All prisoners currently, or who will in the future be, confined in institutions maintained by the Indiana Department of Correction or otherwise subject to the executive directive which prohibits pris-

oners from visiting with minor children if they have a current or past adjudication/conviction of a sex offense involving a minor.

Appellants' App. at 22. On December 1, 2003, the Prisoners filed their summary judgment motion. In response, on April 29, 2004, the Department filed a cross-motion for summary judgment, asserting that the Prisoners do not have a right to unrestricted visitation and that the policy was rational and furthers a legitimate penological goal. After conducting a hearing on the cross motions for summary judgment, the trial court entered findings of fact, conclusions of law, and summary judgment in favor of the Department, determining that ED 02–01 did not violate Indiana law or the First, Eighth, or Fourteenth Amendments. The Prisoners now appeal.

### Discussion and Decision

#### I. Summary Judgment Standard of Review

On review of a trial court's decision to grant or deny summary judgment, we apply the same standard as the trial court: we must decide whether there is a genuine issue of material fact that precludes summary judgment and whether the moving party is entitled to judgment as a matter of law. *Carie v. PSI Energy, Inc.*, 715 N.E.2d 853, 855 (Ind.1999). Once the moving party has sustained its initial

---

of the age of the victim, the offender was over eighteen and in a position of authority over the victim; (3) the victim was physically or mentally impaired or was unaware (unconscious, sleeping, drugged, or intoxicated) at the time of the offense. Additionally, a "force or threat" does not necessarily have to be physical in nature.

5. Additionally, offenders may be permitted to have visitation with minors who are immediate family where the offender is in the last stages of a terminal illness or where a thera-

peutic visit is requested by the victim's licensed therapist.

6. Ten of those 138 applications were still under review as of June 5, 2003.

7. Pursuant to ED 02–01, administrative review is available to inmates who seek a variance from the regulation. In fact, we learned at oral argument that the named plaintiff had sought and received a variance from the regulation at issue.

burden of proving the absence of a genuine issue of material fact and the appropriateness of judgment as a matter of law, the party opposing summary judgment must respond by designating specific facts establishing a genuine issue for trial. *Stephenson v. Ledbetter*, 596 N.E.2d 1369, 1371 (Ind.1992). We may consider only those portions of the pleadings, depositions, and any other matters specifically designated to the trial court by the parties for purposes of the motion for summary judgment. Ind. Trial Rule 56(C), (H). Any doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmoving party. *Cowe v. Forum Group, Inc.*, 575 N.E.2d 630, 633 (Ind.1991). Although the nonmovant has the burden of demonstrating that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that the nonmovant was not improperly denied his or her day in court. *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 667 (Ind.1997). Specific findings and conclusions by the trial court are not required, and although they offer valuable insight into the rationale for the judgment and facilitate our review, we are not limited to reviewing the trial court's reasons for granting or denying summary judgment. *Bernstein v. Glavin*, 725 N.E.2d 455, 458 (Ind.Ct.App.2000), *trans. denied.* Rather, a grant of summary judgment may be affirmed upon any theory supported by the designated materials. *Id.*

■ In addition, "[t]he fact that the parties [made] cross-motions for summary judgment does not alter our standard of review. Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *Ind. Farmers Mut. Ins. Group v. Blaskie*, 727 N.E.2d 13, 15 (Ind.Ct.App.2000).

## II. Analysis

### A. Indiana Law

On appeal, the Prisoners first argue that the trial court erroneously granted summary judgment to the Department because ED 02–01 violates Indiana law, namely Indiana Code Section 11–11–3–9. Indiana Code Section 11–11–3–9(a) permits the Department to prohibit a person from visiting a confined person or to restrict the visit to an extent greater than that allowed under subsection 8,[8] provided that the Department has reasonable grounds to believe that such visitations would threaten the security of the facility or program or the safety of the individuals. Subsection (b) of the statute, which was added in 2004, allows the Department to restrict any person less than eighteen years of age from visiting certain offenders, if: (1) the offender has been convicted of a sex offense or adjudicated a delinquent as a result of an act that would be considered a sex offense if committed by an adult; and (2) the victim of the sex offense was less than eighteen years of age at the time of the offense.

The Prisoners contend that because visitation with minors is forbidden under ED 02–01, as opposed to merely restricted, for the duration of the VMR Offender's confinement without any showing that such visitation would threaten the security or safety of individuals, it violates Indiana

---

8. Indiana Code Section 11–11–3–8 expressly provides confined persons with the opportunity to receive visitors at reasonable times. However, the statute also allows the Department to place reasonable restrictions on such visitations for the purpose of maintaining the security of its facilities and programs, the safety of individuals, and administrative manageability.

law. To support this contention, the Prisoners maintain that Indiana Code Section 11–11–3–9's use of the terms "restrict" and "prohibit" establishes "different degrees of impingement upon a prisoner's right to visit: one that 'prohibits' and one that 'restricts.' " Appellants' Br. at 16. In response, the Department argues that ED 02–01 does not violate Indiana law because "it does not totally prohibit sex offenders from visits with minors." Appellee's Br. at 11. We find both arguments unpersuasive.

■ The primary goal of statutory interpretation is to give effect to the intention of the legislature. *Ind. Dep't of Natural Resources v. Town of Syracuse*, 686 N.E.2d 410, 412 (Ind.Ct.App.1997). This goal is accomplished by examining the statutory language. *Id.* Moreover, the best evidence of legislative intent is the language of the statute itself, giving all words their plain and ordinary meaning unless otherwise indicated by the statute. *Brown v. State*, 790 N.E.2d 1061, 1063–64 (Ind.Ct.App.2003). In construing statutes, we will presume that the legislature intended the language used in the statute to be applied logically and not to bring about an unjust or absurd result. *Id.* at 1064. In addition, though we construe penal statutes against the State to avoid enlarging them beyond the fair meaning of the language used, we will not interpret them so strictly as to defeat the obvious or expressed intent of the legislature. *Armstrong v. State*, 818 N.E.2d 93, 96 (Ind.Ct. App.2004).

■ Moreover, undefined words in a statute are given their plain, ordinary, and usual meaning. Ind.Code § 1–1–4–1(1). In determining the plain and ordinary meaning of a statutory term, courts may use English language dictionaries as well as consider the relationship with other words and phrases. *Armstrong*, 818 N.E.2d at 96. Statutes are examined and interpreted as a whole and the language itself is scrutinized, including the grammatical structure of the clause or sentence at issue. *Id.* Within this analysis, we give words their common and ordinary meaning, without "overemphasizing a strict literal or selective reading of individual words." *Id.* (quotations omitted).

■ As previously noted, Indiana Code 11–11–3–9(b) permits the Department to "restrict" any person less than eighteen years of age from visiting certain sexual offenders. The Prisoners appear to argue that the legislature's deliberate use of the term "restrict," as opposed to the word "prohibit," allows the Department to limit, but not completely forbid, minor visitors from visiting VMR Offenders. However, this reading of the statute is too restrictive and it sacrifices the contextual meaning of Indiana Code Section 11–11–3–9. Indeed, we note that, while the term "restrict" may be defined as "to set bounds or limits to"— a definition advocated by the Prisoners—it may also be defined as to "bar or carefully govern addition or increment to." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1937 (2002) (providing an example of this latter definition as "countries where literacy was largely [restricted] to the upper classes").

Here, read in context, the term "restrict"—as used in Indiana Code Section 11–11–3–9(b)—prevents or bars minors from visiting with offenders, whether the visitation is face-to-face or through a non-contact transparent barrier. Likewise, the directive at issue, ED 02–01, prohibits VMR Offenders from receiving visitors under the age of eighteen. Put another way, the directive restricts minor visitors from visiting VMR offenders. Such restriction is entirely consistent with Indiana Code Section 11–11–3–9. Accordingly, ED 02–01 does not violate Indiana law.

■ Assuming arguendo that the statute's use of the word "restrict," as opposed to "prohibit," defeats the regulation in dispute under Indiana Code Section 11–11–3–9(b), we still find no violation because it is consistent with Indiana Code Section 11–11–3–9(a). That statute allows the Department to prohibit a person from visiting a confined person if the Department has reasonable grounds to believe that such visitation would threaten the security of the facility or program or the safety of the individuals. Thus, the question before us becomes whether, in enacting ED 02–01, the Department had reasonable grounds to believe that visitations between VMR offenders and their minor visitors would either threaten the security of the prison facility or the safety of the individuals involved. To resolve this question, we look to the designated evidence.

Here, the designated evidence reveals that the enactment of ED 02–01 arose out of "a need to protect children from the possibility of being victimized while visiting offenders." Appellants' App. at 56. Indeed, in implementing the directive at issue, the Department relied upon certain research, which indicated that "victims of sex offenses know the perpetrators between 80% and 90% of the time" and, further, that "persons who prey on children often psychologically prepare the children for some time prior to engaging in any sexual activity." *Id.* At the time that it implemented ED 02–01, the Department recognized that sexual offenders have a high rate of recidivism because "they have significant difficulty overcoming their desire to continue molesting children" and was aware of incidents where children had been sexually molested in visiting rooms that were being supervised by prison staff. *Id.* at 62. Lastly, the Department was mindful of its staffing inadequacies, namely, that the supervisory staff: (1) may not recognize the psychological manipulation

employed by sexual offenders; (2) are outnumbered and cannot not be everywhere at all times; and (3) may be psychologically prepared by the offender to view the offender as trustworthy, responsible, and unthreatening.

From this evidence, it is clear that the Department had reasonable grounds to believe that visitation between minors and sexual offenders would either threaten the security of the prison facility or the safety of the individuals involved. Accordingly, ED 02–01 is not in violation of Indiana Code Section 11–11–3–9(a).

## B. Federal Constitutional Law

Second, the Prisoners assert that ED 02–01 is unconstitutional in that it violates the First, Eighth, and Fourteenth Amendments. Specifically, the Prisoners contend that ED 02–01 violates their First Amendment right of association, Fourteenth Amendment right to establish and maintain familial relationships, and Eighth Amendment right to be free from cruel and unusual punishment. We separately address these arguments.

### 1. First and Fourteenth Amendments

The Prisoners first argue that ED 02–01 violates their rights under the First and Fourteenth Amendments to the United States Constitution. Specifically, they contend that ED 02–01 prevents them from exercising their freedom of association with their families.

■ The United States Supreme Court has recognized that "[c]hoices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as 'of basic importance in our society,' . . . rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.*, 519 U.S.

102, 116, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). Therefore, generally, an individual's Fourteenth Amendment right to establish and maintain family associations ·is entitled to "a substantial measure of sanctuary from unjustified interference from the state." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). Nevertheless, "[m]any of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner." *Overton v. Bazzetta*, 539 U.S. 126, 131, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003), *reh'g denied.* Prison inmates only retain those constitutional rights that are consistent with their status as prisoners or with the legitimate penological objectives of the corrective system. A prisoner's freedom of association, for· example, is "among the rights least compatible with incarceration" and, therefore, "[s]ome curtailment of that freedom must be expected in the prison context." *Overton*, 539 U.S. at 131, 123 S.Ct. 2162; *see also Ind. Dep't of Correction v. Stagg*, 556 N.E.2d 1338, 1342 (Ind.Ct.App.1990) (recognizing that Department may place restrictions upon visitation to maintain security, promote safety, and retain manageability of correctional institutions), *reh'g denied, trans. denied.*

 When a prison regulation impinges upon an inmate's constitutional rights, such as his or her right of association or right to maintain familial relationships, the regulation must be reasonably related to legitimate penological interests and must not represent an exaggerated response to those concerns. *Cohn v. Strawhorn*, 721 N.E.2d 342, 350 (Ind.Ct. App.1999), *trans. denied.* In evaluating the constitutionality of a particular prison regulation, such as the one at issue, the following factors should be considered: (1) whether a valid, rational connection exists between the regulation and a legitimate government interest underlying the rule; (2) whether there are alternative means of exercising the right in question that remain available to prisoners; (3) the impact that accommodation of the asserted constitutional right would have on guards and other inmates and the allocation of prison resources; and (4) whether there .are ready alternatives to the prison regulation. *See Turner v. Safley*, 482 U.S. 78, 89–91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

 We will accord "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 539 U.S. at 132, 123 S.Ct. 2162. The burden is upon the prisoner to disprove the validity of the prison regulation. *Id.*

 Turning to the regulation in dispute, we conclude that there is a rational correlation between the Department's interest in protecting child visitors from sexual or other misconduct and ED 02–01. Protecting children from harm is a legitimate goal. *Id.* at 133, 123 S.Ct. 2162. The logical connection between. the Department's interest and regulation is clear: preventing VMR offenders from receiving minor visitors will reduce the number of minors with whom they come into contact and, thus, the number of child molestation incidents that might have emanated from those contacts or visitations, which, in turn, will protect children. The mere fact that the directive does not ban all communications between VMR offenders and minors or segregate all such offenders from the visitation room—where the offenders may come into contact with minors visiting non-VMR offenders—does not render it irrational and, thus, unconstitutional. To be constitutional, ED 02–01 does not have to represent the most narrowly-tailored

remedy or survive any other form of heightened or strict scrutiny. Rather, the regulation need only be rational.

Having determined that ED 02–01 bears a rational relationship to a legitimate penological interest, we consider whether the Prisoners have alternative means of exercising their right to associate with their families. Were it shown that no alternative means of communication existed, though it would not be conclusive, it would be some evidence that the regulation at issue was unreasonable. *See, e.g., Overton,* 539 U.S. at 135, 123 S.Ct. 2162.

Here, such a showing cannot be made because, even with the enactment of the regulation, the Prisoners have alternate means to associate with their minor family members. Indeed, the Department notes that sexual offenders are free to communicate with their family, including minor members, "by mail, telephone calls or messages brought by persons permitted to visit." Appellee's Br. at 15.

Next, we examine the impact that accommodation of the prisoner's rights to associate with minor visitors would have on guards and other inmates and the allocation of prison resources. In their brief, the appellants presume that the costs for accommodating their visitation demands with minors would be de minimis. For example, the Prisoners contend that because all facilities in which they are presently housed have areas for non-contact visitation, the alternative of non-contact visitations could presumably be used without major disruption. However, merely presuming that a cost would be de minimis does not make it so, nor does it satisfy the Prisoners' burden to demonstrate a genuine issue of material fact sufficient to defeat the trial court's grant of summary judgment.

Lastly, we consider whether the presence of ready alternatives undermines the reasonableness of ED 02–01. This factor, however, does not impose a least-restrictive-alternative test, but inquires instead whether the Prisoners have pointed to some obvious regulatory alternative that fully accommodates their right of association while not imposing more than a de minimis cost to the valid penological goal. *Overton,* 539 U.S. at 136, 123 S.Ct. 2162. The Prisoners have failed to proffer any alternative that would meet this high standard for the regulation at issue. While areas for non-contact visitations may be readily available at these prison facilities, the Prisoners have failed to demonstrate that such an alternative would meet with a de minimis cost. We remind the Prisoners that we accord substantial deference to the professional judgment of prison administrators in defining the legitimate goals of a corrections system and determining the most appropriate means to accomplish them. *Id.* at 132, 123 S.Ct. 2162. Likewise, and as the Prisoners concede, the proposed alternative of requiring the Department to provide evaluations of prisoners to determine whether they are likely to harm child visitors, i.e., the so-called phase I, phase II, and phase III programming, cannot be accomplished at a de minimis cost. Accordingly, the Prisoners have failed to raise a genuine issue of material fact that ED 02–01 violates their rights of association under the First and Fourteenth Amendments.

## 2. Eighth Amendment

The Prisoners also assert that the restriction on minor visitation for VMR offenders is a cruel and unusual condition of confinement in violation of the Eighth Amendment.[9] The restriction undoubtedly

9. The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive

makes the prisoner's confinement more difficult to bear. However, it does not, under the circumstances of this case, fall below the standards mandated by the Eighth Amendment. Much of what we have already discussed regarding the withdrawal of privileges that incarceration is expected to bring applies in the context of the Eighth Amendment. Although ED 02–01 restricts VMR offenders from receiving minor visitors, it does not create inhumane prison conditions, deprive inmates of basic necessities, fail to protect their health or safety, or represent a dramatic departure from accepted standards for conditions of confinement. *See Overton*, 539 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162. Nor does the regulation involve the infliction of pain or injury, or deliberate indifference to the risk that it might occur. *See, e.g., id.* If ED 02–01 required the withdrawal of all visitation privileges or if it were applied in an arbitrary manner to a particular inmate, this case would present different considerations. However, under the present circumstances, the Prisoners have failed to show that the regulation at issue rises to the level of an Eighth Amendment violation. Accordingly, the trial court did not err by granting summary judgment to the Department.

For the foregoing reasons, we affirm the trial court's grant of summary judgment to the Department.

Affirmed.

MAY, J., concurs.

BAKER, J., dissents with separate opinion.

BAKER, Judge, dissenting.

Because I believe that ED 02–01 violates both Indiana law and the Constitution, I respectfully dissent from the majority opinion and vote to reverse the judgment of the trial court.

Indiana Code section 11–11–3–8 provides in pertinent part:

A confined person may receive visitors at reasonable times. The department may, for the purpose of maintaining the security of its facilities and programs, the safety of individuals, and administrative manageability, place reasonable restrictions on visits consistent with the following:

(1) Visits may be conducted in areas where a confined person and his visitors are not physically separated and that allow for as much informality and privacy as possible . . . .

(2) Any restrictions regarding visiting times, the number of visitors a person may receive on a particular occasion or during a designated period of time, or the duration of a particular visit must take into account the accessibility of the facility or program to the visiting public . . . .

(3) Any restrictions imposed on visitation under this section must be communicated to the confined person and be made accessible to the visiting public.

(4) The department may not impose restrictions on visitation that obstruct the availability of adequate legal representation . . . .

At the time that this case was litigated in the trial court, Indiana Code section 11–11–3–9 provided that "a person may be prohibited from visiting a confined person, or the visit may be restricted to an extent greater than allowed under Section 8 of this chapter, if the department has reasonable grounds to believe that the visits would threaten the security of the facility or program or the safety of the individu-

---

fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII.

als." This statute was amended, effective July 1, 2004, to read:

(a) A person may be *prohibited* from visiting a confined person, *or* the visit may be *restricted* to an extent greater than allowed under section 8 of this chapter, if the department has reasonable grounds to believe that the visit would threaten the security of the facility or program or the safety of individuals.

(b) The department may *restrict* any person less than eighteen (18) years of age from visiting an offender, if:

(1) the offender has been:

(A) convicted of a sex offense under IC 35–42–4; or

(B) adjudicated delinquent as a result of an act that would be considered a sex offense under IC 35–42–4 if committed by an adult; and

(2) the victim of the sex offense was less than eighteen (18) years of age at the time of the offense.

(c) If the department *prohibits or restricts* visitation between a confined person and another person under this section, it shall notify the confined person of that *prohibition or restriction.* The notice must be in writing and include the reason for the action, the name of the person who made the decision, and the fact that the action may be challenged through the grievance procedure.

(d) The department shall establish written guidelines for implementing this section.

(Emphasis added). My reading of the plain language of the statute indicates that the General Assembly intended "prohibit" and "restrict" to mean two different things. Were this not the case, there would be no reason to use both words. By reading the statute to mean that "prohibit" and "restrict" are the same thing, the majority has nullified the meaning of one of the two words. To prohibit means, "To forbid (an action or thing) by or as by a command or statute; to interdict." *Oxford English Dictionary online*, at http://www.oed.com (last visited May 19, 2005). To restrict means, "To confine (some person or thing) to or within certain limits; to limit or bound." *Id.*

It is apparent to me that ED–02–01 acts as a total prohibition to anyone who falls under the ambit of ED 02–01. Visitation with minors is forbidden for the duration of the VMR prisoners' confinement without any particularized showing that such visits would threaten security or the safety of individuals. But the General Assembly, through the amendment of Indiana Code section 11–11–3–9, has rejected the argument that the fact that an individual has been convicted of a sex offense against a minor automatically means that visitation will endanger the safety of individual minors. This conclusion is supported by the deposition of the State's own expert, Dr. Richard Lawlor, which indicates that cross-over behaviors are unlikely between different types of sex offenders, e.g., a pedophile would be unlikely to molest a more mature child, such as a teenager. Appellants' App. p. 96. Furthermore, any risk can be minimized by restricting visitation to non-contact visits. I would therefore find that ED 02–01 violates Indiana code section 11–11–3–8.

I further disagree with the majority's determination that ED 02–01 does not violate the Prisoners' First and Fourteenth Amendment rights. The DOC has listed four purposes for ED 02–01: (1) denying visitation will protect children from the possibility of abuse during visits; (2) denying visitation to VMR prisoners will assist in breaking the cycle of abuse because it will reduce the prisoners' ability to fantasize about children; (3) denying visitation will deny sex offenders the opportunity to

groom children for future offenses; and (4) denying visitation will reduce trauma for the victims of abuse. Appellants' App. p. 12.

As to the fourth rationale, the prisoners rightly make no argument that they should be permitted to visit with the victims of their abuse. Moreover, the trial court found—and the evidence is uncontested—that denying visitation will not change a prisoner's ability to fantasize. Appellants' App. p. 13. This leaves us with the twin rationales of protecting children from abuse during visitation and protecting children from grooming during visitation. While I strongly agree that protecting children is a valid governmental interest, it is difficult to believe that the State is actually protecting children as the current visitation situation stands. VMR prisoners who are not otherwise restricted may visit with adults in the open visitation rooms. As the State notes, these rooms are "wild and crazy" places with many children "running around" and "a lot of activity." Appellants' App. p. 88. Thus, VMR prisoners have access to children for possible abuse, grooming, or fantasy whether or not those children are there to visit the VMR prisoner. Furthermore, as noted above, there is evidence that many VMR prisoners are not at risk of harming the vast majority of children. Pedophiles will rarely offend against post-pubescent children; perpetrators of incest will rarely commit offenses outside of the family. Appellants' App. p. 96. Moreover, the State's argument that it is concerned about the possibility of grooming in non-contact visitation is belied by the fact that VMR prisoners are allowed telephonic contact with minors. If grooming can be accomplished over a closed-circuit television, so too can it be done over the telephone. I would therefore find that there is no rational connection between the asserted governmental interests and the regulation.

Moreover, all of the facilities in which the prisoners are currently housed have areas for non-contact visitation that could be utilized by VMR prisoners without major disruption. The cost to allow this alternative method of visitation would therefore be de minimis, and disruption to the prison and the guards would be minimal.

The DOC asserts that the screening process that the prisoners seek to identify and grant visitation to VMR offenders who pose no risk to children is unduly burdensome. Dr. Lawlor testified that the nature of pedophiles makes diagnosis difficult and burdensome, requiring a staff of "several thousand" and "many dozens of mental health professionals...." Appellants' App. p. 98. Nevertheless, the DOC already provides this type of service. The SOMM program, which is the DOC's general method for managing sex offenders, has three phases: Phase I is a 15–hour awareness program given to all adult male prisoners with a current conviction involving any sex offense, Phase II is a voluntary program that is offered to prisoners within three years of the termination of their commitment, and Phase III involves parole conditions imposed on sex offenders after their release. Appellants' App. p. 12. Although there are more than 1400 VMR prisoners within three years of their release, only 72 are in Phase II programming, and there are waitlists at every facility that offers Phase II. Appellants' App. p. 34, 45–46. At oral argument, the State noted that it is working to expand the Phase II program. Although the cost of expansion may be more than de minimis, the framework already exists for evaluating and rehabilitating sex offenders.

The final *Turner* factor examines whether there are ready alternatives to the challenged regulation. As previously noted, non-contact visitation is a readily available

alternative that would remove many or all of the State's concerns of children being at risk of molestation during visits. The cost will be de minimis because the non-contact areas already exist at the facilities. Furthermore, there is no evidence that child molestation has ever happened in non-contact visitation areas. Additionally, the DOC could provide evaluations of prisoners by making Phase II programming more available.

In sum, I would find that ED 02–01 violates Indiana law because it acts as a prohibition without any particularized showing that visits with minors would threaten security or the safety of individuals. I would also find that ED 02–01 unreasonably impinges on inmates' freedom of association because there is no rational connection between the asserted governmental interests and the regulation. Thus, I vote to reverse the judgment of the trial court.